**Kathleen R. REITER, Individually and as Representative of the class of all personal users of Hearing Aids located in the U. S., Appellee,**

v.

**SONOTONE CORPORATION, a New York Corporation, Beltone Electronics Corporation, an Illinois Corporation, Dahlberg Electronics, Inc., a Minn. Corporation, Textron, Inc., a Delaware Corporation, and Radioear Corporation, a Delaware Corporation, Appellants.**

No. 77–1474.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1977.

Decided June 19, 1978.

Rehearing En Banc Denied Aug. 11, 1978.

Julian R. Wilheim, Chicago, Ill. and Elliot S. Kaplan, Minneapolis, Minn., argued, for appellants.

John E. Thomas, St. Paul, Minn., argued and on brief, for appellee.

Before BRIGHT, WEBSTER,* and HENLEY, Circuit Judges.

BRIGHT, Circuit Judge.

Plaintiff-appellee, Kathleen R. Reiter, commenced this class action for treble damages on May 2, 1975, against defendants-appellants, hearing aid manufacturers, under section 4 of the Clayton Act, 15 U.S.C. § 15 (1976). In her complaint, she alleged that these manufacturers by combining and conspiring to violate the antitrust laws had controlled their dealers' sales practices, particularly the price at which hearing aids ultimately would be sold to consumers.[1] Reiter brought the action for relief under the antitrust laws on behalf of herself and "all persons in the United States or any sub part thereof who directly or indirectly purchased * * * hearing aids [at the allegedly unlawful prices]."

The manufacturers moved for dismissal or, alternatively, for summary judgment arguing, *inter alia*, that as noncommercial consumers Kathleen Reiter and the class she sought to represent had not been injured in their "business or property" under section 4 of the Clayton Act. The district court, in a comprehensive memorandum opinion,[2] denied the manufacturers' motions but certified the issue of consumer standing as appropriate for interlocutory review under 28 U.S.C. § 1292(b) (1970); we authorized the interlocutory appeal.

In this appeal, we are presented the narrow question whether a consumer who purchases a hearing aid for personal use at a higher price because of a manufacturer's allegedly anticompetitive activity suffers injury to business or property under section

---

* The Honorable William H. Webster participated in oral argument but took no part in the disposition of this appeal.

1. The complaint sought both monetary and injunctive relief.

2. The district court opinion is reported at 435 F.Supp. 933 (D.Minn.1977).

4 of the Clayton Act. Section 4 provides in pertinent part:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. [15 U.S.C. § 15 (1976).]

We hold that such consumers are not injured in their "business or property" for purposes of section 4 and reverse the district court.[3]

### I. *Legislative History.*

Section 4 of the Clayton Act was first codified in section 2 of the Sherman Act. The Sherman Act, promulgated in 1890, was a congressional reaction to the concentrations of economic power that emerged from the industrialism of the mid-nineteenth century. *See* Note, *Standing to Sue for Treble Damages Under Section 4 of the Clayton Act,* 64 Colum.L.Rev. 570, 570 (1964). Declaring monopolies and restraints of trade illegal, Congress sought "to free competition in business and commercial transactions * * *." *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1939). The history of the Sherman Act, as evidenced in the legislative proceedings,[4] emphatically supports the conclusion that the Act was designed to prevent restraints of trade significantly affecting business competition. *Id.* at 493 n. 15, 60 S.Ct. 982.[5]

The legislative history underlying the provision permitting private damage actions, while voluminous and in parts illuminating, is less explicit. Courts and commentators have been unable to agree on the precise congressional intent.

As originally introduced by Senator Sherman in the Senate Finance Committee, the bill in section 2 broadly authorized damage actions by "any person or corporation injured or damnified by [an unlawful] arrangement, contract, agreement, trust, or

---

**3.** Appellees did not purchase their hearing aids directly from the manufacturers. In *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Supreme Court held that only direct purchasers may sue for treble damages under § 4 of the Clayton Act. The Court recognized, however, that indirect purchasers may maintain actions involving cost-plus contracts as well as those "in which market forces have been superseded [as when] the direct purchaser is owned or controlled by its customer." *Id.* at 736 & n. 16, 97 S.Ct. at 2070. Appellees contend that the manufacturers in this case engaged in various prohibited vertical restraints including resale price maintenance. In view of our holding that ordinary consumers may not maintain treble damage actions, we need not decide whether appellants' alleged violations constitute an exception to *Illinois Brick.*

**4.** For an exhaustive analysis of the Sherman Act's legislative history, see M. Forkosch, *Antitrust and the Consumer (Enforcement)* 32–170 (1956).

**5.** An early resolution introduced on July 10, 1888, by Senator Sherman and passed without discussion directed the Senate Finance Committee to study the efficacy of curtailing "trusts or combinations * * * made with a view * * * to prevent *free and full competition* * * * with such penalties and provisions * * * as will tend to preserve freedom of

trade and production [and] the natural competition of increasing production * * *." 19 Cong.Rec. 6041 (1888) (remarks of Sen. Sherman) (emphasis supplied). This resolution, which gave rise to the congressional debates and ultimately the Sherman Act, explicitly articulated the economic philosophy of the bill's proponents. The bills introduced between 1888 and 1890 are consistent with this approach. *See, e. g.,* S.3445, S.3510, and H.R.Rep.11339, 50th Cong., 1st Sess. (1888) (arrangements that tend to prevent full and free competition in the production, manufacture, or sale of articles are void), *cited in Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493–94 n. 15, 60 S.Ct. 982, 84 L.Ed. 1311 (1939). The debates accompanying the final bill also stressed the importance of preserving competition and the need to proscribe those agreements, combinations, and trusts whose purpose was to destroy competition. *See generally* 21 Cong.Rec. 2457–2461 (1890) (remarks of Sen. Sherman); *id.* at 2558 (remarks of Sen. Pugh); *id.* at 2729 (remarks of Sen. Platt); *id.* at 3147 (remarks of Sen. George); *id.* at 4089 (remarks of Rep. Culberson).

The Supreme Court has noted this virtual unanimity of Congress in seeking to protect and preserve a free competitive environment. *See Apex Hosiery Co. v. Leader, supra,* 310 U.S. at 493–95 n. 15, 60 S.Ct. 982.

combination * * *." S.1, 51st Cong., 1st Sess. § 2 (1889). This original language was, however, completely revised by the Senate Judiciary Committee. The amended language, which became section 7, limited treble damages to any person injured in his business or property by an antitrust violation. 21 Cong.Rec. 2901 (1890).

Congress failed to indicate explicitly the rationale for limiting the injuries for which treble damage actions could be maintained. Senator Morgan, however, recognized the need to limit the breadth and scope of private actions.

> This bill ought not to be a breeder of lawsuits. If there is any one duty we have got higher than another in respect of the general judiciary of the United States, it is to suppress litigation and have justice done without litigation as far as we can. [21 Cong.Rec. 3149 (1890) (remarks of Sen. Morgan).]

The Supreme Court has noted that the legislative history is not very instructive in explaining the purpose for limiting recovery to business or property injuries. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). *See also* Comment, *Mangano and Ultimate Consumer Standing: The Misuse of the Hanover Doctrine*, 72 Colum.L.Rev. 394, 396 n. 15 (1972).

Despite its somewhat inconclusive explanation, however, we cannot ignore Congress' explicit rejection of the original Sherman bill's broad language in favor of the statute as enacted. While ordinary consumers arguably would have been included in if not encouraged by the bill as originally introduced, we think the statute as enacted was intended to limit the class of persons able to bring a private damage action. *See* 21 Cong.Rec. 3149 (1890) (remarks of Sen. Morgan).

■ Some members of Congress argued that the enacted provision containing the limiting language would be of little use to the average consumer. In fact, Senator George, recognizing that consumers would be virtually remediless with the statute as written, urged without success more effective remedies for consumers.

> [T]he poor man, the consumer, the laborer, the farmer, the mechanic, the country merchant, all that large class of American citizens who constitute 90 per cent of our population and who are the real sufferers will have no opportunity of redress, and the bill, so far as they are concerned, will be a snare and a mere delusion. [21 Cong.Rec. 3150 (1890) (remarks of Sen. George).] [6]

*See id.* at 3147–48, 1767–68; *id.* at 2571 (remarks of Rep. Hiscock); *id.* at 2564 (remarks of Sen. Reagan). We note this congressional concern with the statute's inability to aid the consumer. We cannot, however, amend the Act to include that which Congress neglected or intentionally excluded. *Cf. Pfizer, Inc. v. Government of India,* 434 U.S. 308, 98 S.Ct. 584, 587, 54 L.Ed.2d 563 (1978) (resolution of section 4's meaning "turns on the interpretation of the statute").

In 1914, Congress enacted the Clayton Act. Section 7 of the Sherman Act became section 4 of the new statute and retained the "business or property" limitation. The Senate Report accompanying the Clayton Act indicates that Congress, by its enactment, did not intend to amend the Sherman Act. The report comments:

> This section, which gives any person injured by a violation of the antitrust acts the right to sue in the Federal courts for threefold the damages by him sustained * * * is not proposed to be amended in any particular. [S.Rep.No. 698, 63rd Cong., 2d Sess. 45 (1914).]

■ Congress' principal concern in enacting the Clayton Act, as articulated in its comments accompanying the statute, was to provide a remedy to persons suffering a business injury as a result of combinations

---

6. Senator George's remarks reflect the practical rather than theoretical obstacles to consumer actions because the mechanic or country merchant alleging a business or commercial injury would be able to sue for treble damages even if consumers failing to allege such injury could not.

operating in restraint of trade. *See* 51 Cong.Rec. 9270 (1914) (remarks of Rep. Carlin). During the House debates, Representative Webb, a member of the Judiciary Committee, who explained the various statutory provisions, described section 4 (then section 5) as providing a treble damage cause of action to "any person * * * injured in his *business,* by reason of anything forbidden in the antitrust laws * *." 51 Cong.Rec. 9073 (1914) (remarks of Rep. Webb) (emphasis supplied). *See also* 51 Cong.Rec. 16,274 (1914) (remarks by Rep. Webb) (section 4 authorizes suits by a *business* man).

Representative Taggart, a member of the House Finance Committee, emphasized the commercial nature of the injury for which Congress intended to provide relief.

A great many suits have been brought against trusts [that] have been dissolved. Some few have been punished, but the people whose business they destroyed have been practically without a remedy. When this bill becomes a law, the person who willfully destroys another person's business will do so at his peril.

The bill is framed for the purpose of liberating *business* and not for the purpose of injuring or destroying any *business. Its great purpose is to protect small business from big business,* and to compel all business to be conducted honestly. [51 Cong.Rec. 9198 (1914) (remarks of Rep. Taggart) (emphasis supplied).]

Senator Reed similarly identified business as the primary interest protected by the statute.

It follows that the Argus eyes of thousands of business men now being injured will be upon the powerful concerns, and the thousand arms of the courts will be employed to prevent their evil practices. [51 Cong.Rec. 12,939 (1914) (remarks of Sen. Reed).]

Moreover, in section 16 the Clayton Act permits injunctive relief to "[a]ny person * * * threatened [with] loss or damage by a violation of the antitrust laws * *." 15 U.S.C. § 26 (1976). This rather broad provision does not contain section 4's business or property limitation.[7] We think Congress, in considering this carefully drafted statute, contemplated the modes of relief that, consistent with the Act's purposes, would most effectively protect the various interests in the economy.

In sum, the legislative history indicates a congressional awareness that the antitrust laws would benefit the small business owner but would be of little value to the ordinary consumer.[8]

## II. *Judicial Decisions—"Business or Property."*

The meaning and scope of "business or property" in section 4 have generally been discussed by the courts in contexts other than consumer standing.[9] There has been

---

7. The Supreme Court has recognized that these two sections are "notably different." *See Hawaii v. Standard Oil Co.,* 405 U.S. 251, 260–61, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (comparing "business or property" requirement of § 4 with "threatened loss or damage" requirement of § 16); *cf. Calnetics Corp. v. Volkswagon of America, Inc.,* 348 F.Supp. 606 (C.D.Cal.1972), *modified,* 532 F.2d 674 (9th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976) (plaintiff entitled to injunctive relief despite failure to prove causal connection necessary to support claim for damages).

8. In contrast, the Supreme Court acknowledged in *Pfizer, Inc. v. Government of India,* 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978): "It seems apparent * * * the question [whether foreign nations are entitled to sue for treble damages under § 4 of the Clayton

Act] was never considered at the time the Sherman and Clayton Acts were enacted." *Id.* at 587.

9. Independent of the consumer standing issue, the United States appellate courts have narrowed the class of persons able to seek treble damages for antitrust violations by employing a causation analysis similar to the proximate cause limitation contained in tort law. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 760, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (Brennan, J., dissenting). The right to recover in the Ninth, Fifth, Fourth, and Second Circuits is limited to those in the "target area" of the alleged violative activity. *See, e. g., Commerce Tankers Corp. v. National Maritime Union of America,* 553 F.2d 793, 800–01 (2d Cir. 1977), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *Jeffrey v. Southwestern*

some recognition that an injury to property is different and, perhaps, broader than a business injury.[10] *See generally* Note, *Standing to Sue for Treble Damages Under Section 4 of the Clayton Act,* 64 Colum.L. Rev. 570, 577–78 (1964).

In *Chattanooga Foundry and Pipe Works v. City of Atlanta,* 203 U.S. 390, 396, 399, 27 S.Ct. 65, 66, 67, 51 L.Ed. 241 (1906), the Court, through Mr. Justice Holmes, discussed "business or property."

The facts gave rise to a cause of action under the Act of Congress. * * * [The City] was injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe. A person whose property is diminished by a payment of money wrongfully induced is injured in his property.

\*     \*     \*     \*     \*     \*

A man is injured in his property when his property is diminished.

On its face, the Court's language suggests that consumers forced to pay more for a product by virtue of anticompetitive activity suffer injury to their property. The City of Atlanta, however, had commenced the action against two companies that allegedly had combined to keep the price of iron water pipe artificially high. As a result, the cost to the city of supplying water to its residents was increased. Thus, the city's claim arguably sought recovery for a business injury.

■ Neither the Supreme Court nor a federal appellate court has specifically addressed whether ordinary consumers who purchase a product for personal use at a higher price because of anticompetitive activity suffer an injury to property under section 4 of the Clayton Act.[11] The Supreme Court has intimated that such injury,

---

*Bell,* 518 F.2d 1129, 1131 (5th Cir. 1975); *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31,* 481 F.2d 122, 128–29 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); *South Carolina Council of Milk Producers, Inc. v. Newton,* 360 F.2d 414, 418 (4th Cir.), *cert. denied,* 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966). The Third Circuit has narrowed standing to those plaintiffs suffering a "direct injury." *See Bravman v. Bassett Furniture Industries, Inc.,* 552 F.2d 90, 96–97 (3d Cir. 1977), *cert. denied,* 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977). The Sixth Circuit has examined whether the plaintiff was in the "protected zone of interest." *See Malamud v. Sinclair Oil Corp.,* 521 F.2d 1142, 1151 (6th Cir. 1975), *citing Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 124 (1970). This circuit has required an "injury * * * something more than remote * * *." *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.,* 368 F.2d 679, 689 (8th Cir. 1966).

10. In *Waldron v. British Petroleum Co.,* 231 F.Supp. 72 (S.D.N.Y.1964), the court noted the distinction between business and property. The plaintiff in that case had entered into a contract that would have given him oil importation rights. He was alleging that an illegal conspiracy prevented his importation of the oil. Because his enterprise was only potential, the court found that no "business" within the meaning of the Act existed. The court went on to decide, however, that the statute uses the two terms in the disjunctive; § 4 as it is written is broader than just business. "The word 'property' has wider scope and is more exten-

sive than the word 'business.' Less is required to prove 'property' than to prove 'business.'" *Id.* at 86. Under this conception, property is any legally protected interest. *Id.*

This distinction was also noted in *Hamman v. United States,* 267 F.Supp. 420 (D.Mont.1967), *appeal dismissed,* 399 F.2d 673 (9th Cir. 1968), cited with approval in *Hawaii v. Standard Oil Co., supra,* 405 U.S. at 264, 92 S.Ct. 885. There, damages were sought for the death of a workman who had been killed during the construction of a dam. In one count, plaintiff alleged that: (1) an illegal conspiracy in restraint of trade had prevented other, more careful construction companies from bidding on the job; (2) defendant's failure to exercise reasonable care had caused decedent's death; thus, (3) plaintiff who had suffered loss of consortium, a recognized property interest under state law, had been injured in her property under § 4 of the Clayton Act. The court, citing *Waldron, supra,* stated that "property" in § 4, is broader than business, but that an injury to business or property requires "a commercial venture or enterprise." 267 F.Supp. at 432. The court dismissed the count on the ground that, while plaintiff had suffered an injury to property under state law, she had not suffered an injury to the types of property "protected * * * by the antitrust laws." *Id.* The court also stressed the absence of proximate cause between the injury and the alleged wrongful conduct. *See* n. 9 *supra.*

11. A trilogy of cases recently decided by Judge Williams in the Northern District of California has been consolidated and is currently before

in order to be legally cognizable, must be of a commercial nature.

Like the lower courts that have considered the meaning of the words "business or property," we conclude that they refer to commercial interests or enterprises. [*Hawaii v. Standard Oil Co.*, *supra*, 405 U.S. at 264, 92 S.Ct. at 892 (1972).]

In *Hawaii*, the state had brought a *parens patriae* action on behalf of its citizens as the representative of a class of all purchasers in the state. The Court denied standing to the state to sue for injuries to the general economy.

When the State seeks damages for injuries to its *commercial interests*, it may sue under § 4. But where, as here, the State seeks damages for other injuries, it is not properly within the Clayton Act. [*Id.* (emphasis supplied).] [12]

This circuit has approved language suggesting that, in order to be recoverable, the injury to "business or property" must be a competitive one. See *Ragar v. T. J. Raney & Sons*, 388 F.Supp. 1184, 1187 (E.D.Ark.), *aff'd*, 521 F.2d 795 (8th Cir. 1975) (*per curiam*). *Ragar* involved an antitrust action by property owners against investment banking firms who had conspired to keep

---

the Ninth Circuit. In all three cases, Judge Williams held that consumers purchasing products for personal use suffer no injury to business or property under § 4 and may not bring treble damage actions for relief. See *Weinberg v. Federated Department Stores*, 426 F.Supp. 880 (N.D.Cal.1977); *Gutierrez v. E. & J. Gallo Winery Co.*, 425 F.Supp. 1221 (N.D.Cal.1977); *Smith v. Toyota Motor Sales U. S. A., Inc.*, No. 75–0727 (N.D.Cal. Jan. 11, 1977), *appeals docketed*, Nos. 77–1845, 77–1724, 77–1725, 77–1850, 77–1851, 77–1852 (9th Cir. 1977). Judge Williams analyzed the legislative history of the statute, relying upon the change in the section's language, the fear of a proliferation of lawsuits, and statements in the congressional debates extolling the benefits of the Act to businessmen. He also examined language in several court decisions, including *Hawaii v. Standard Oil Co.*, *supra*, and *Ragar v. T. J. Raney & Sons*, 388 F.Supp. 1184 (E.D.Ark.), *aff'd*, 521 F.2d 795 (8th Cir. 1975) (*per curiam*), *see infra*, and concluded that the phrase "business or property" cannot be read in the disjunctive but "is a conjunctive reference to interests of a business nature." *Gutierrez v. E. & J. Gallo Winery Co.*, *supra*, 425 F.Supp. at 1225. Therefore, consumers who alleged no injury to a business enterprise were held to be without standing to sue.

12. The Court did not, however, define commercial interest and, in a footnote, distinguished an injury suffered by the state in its capacity as a "consumer in the marketplace," which is within the scope of § 4's provision, from that occurring merely to the state's general economy, which is not. *Hawaii v. Standard Oil Co.*, *supra*, 405 U.S. at 262–63 n. 14, 92 S.Ct. 885. Similarly, in explaining a provision enabling the United States to sue for antitrust violations that is also limited to injuries to business or property, the Court stated the provision was not intended to cover general injuries to the national economy, "but only * * * those * * * suffered * * * as a consumer of

goods and services." *Id.* at 265, 92 S.Ct. at 892. The Court also noted that a large part of any injury to the state's general economy "is no more than a reflection of injuries to the 'business or property' of consumers, for which they may recover themselves under § 4." *Id.* at 264, 92 S.Ct. at 892.

In addition to this language by the Court in *Hawaii*, appellee cites, and we note, several judicial references, some by the Supreme Court, suggesting that "consumers in the marketplace" should be permitted redress for injuries suffered through anticompetitive activity. See, e. g., *Pfizer, Inc. v. Government of India*, 434 U.S. 308, 98 S.Ct. 584, 592, 594, 54 L.Ed.2d 563 (Burger, C. J., dissenting) (1978); *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 n. 10, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In *Cleary v. Chalk*, 159 U.S.App.D.C. 415, 419, 488 F.2d 1315, 1319 n. 17 (1973), *cert. denied*, 416 U.S. 938, 94 S.Ct. 1940, 40 L.Ed.2d 289 (1974), the court, acknowledging that the phrase "business or property" refers to commercial interests or enterprises, stated: "We have no doubt that a consumer of service who is illegally overcharged sustains a property injury no less than a consumer of goods." Relying upon *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906), the court indicated that a consumer of goods is injured in his property by violations of the antitrust laws that raise the price of goods. In *Bravman v. Bassett Furniture Industries, Inc.*, *supra*, a suit by a sales representative of a furniture manufacturer, the court stated: "The right of consumers to challenge price fixing conspiracies is well established." 552 F.2d at 99 n. 23.

These references, however, are not inconsistent with our construction of § 4. Consumers who suffer commercial injury to business or property may sue for treble damages. Moreover, the consumer standing question presented in this appeal was not addressed by these courts. See n. 18 *infra*.

interest rates on municipal bonds higher than they otherwise would have been. The district court, finding that plaintiff's injury was remotely related to the alleged violation, held that plaintiffs lacked standing to sue. Alternatively, the court said the plaintiffs had not been injured in their "business or property" because that phrase requires a competitive injury.

> Since the purpose of the antitrust laws is the "prevention of restraints to free competition in business and commercial transactions," * * * it follows that only those persons injured in their competitive positions in a business in which they are engaged should be permitted standing to sue under the Clayton Act. [388 F.Supp. at 1187.]

■ Other circuits have similarly suggested that section 4 requires a competitive or commercial injury. In *GAF Corp. v. Circle Floor Co.*, 463 F.2d 752 (2d Cir. 1972), *cert. denied*, 413 U.S. 901, 93 S.Ct 3058, 37 L.Ed.2d 1045 (1973), one company alleged that another company was attempting a takeover in order to monopolize the industry. The court, concluding that the policy favored by the Act is competition, sustained the district court's dismissal of the complaint for failure to state a claim.

> The Supreme Court has consistently reiterated that "[t]he Sherman Act was * * * aimed at preserving free and unfettered *competition* as the rule of trade," and that "the policy unequivocally laid down by the Act is competition." * * * The courts, in interpreting § 4 of the Clayton Act and its predecessor, have endeavored, although with some inconsistency and conflict, to promote the policy of competition established by the Sherman and Clayton Acts by interpreting § 4 as allowing treble damages only

to those who have suffered some diminution of their ability to compete. Whether viewed in terms of "lack of standing" or the absence of *antitrust* damages, the courts, in denying recovery to various kinds of plaintiffs, have sought to confine recovery to those who have been injured by restraints on competitive forces in the economy.

Not all persons who may be able to trace an economic loss to a violation of the antitrust laws can recover under those laws. The Supreme Court has stated that, in determining who may sue under § 4, the central question is one of *competitive* injury. [*Id.* at 757–58 (emphasis in original).] [13]

In *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31*, 481 F.2d 122 (9th Cir.), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), the Ninth Circuit, citing *Hawaii v. Standard Oil Co.*, supra, also expressed the view that the phrase "business or property" limits standing to those engaged in commercial ventures and enterprises. 481 F.2d at 131. *See also Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172, 1175 (5th Cir. 1976) (in order to be cognizable under section 4, the injury must be to commercial interests or enterprises); *cf. Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 730 (10th Cir.), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973) (in order to satisfy section 4's business or property prerequisite, fired worker must demonstrate that "his job [was] a commercial venture or enterprise").

Our review of the cases convinces us that the few courts specifically addressing the question have recognized that section 4 requires a commercial or competitive injury.

13. *But see Pfizer, Inc. v. Government of India, supra*, 98 S.Ct. at 588, *citing Illinois Brick Co. v. Illinois, supra*. In *Pfizer*, the Court noted that "§ 4 has two purposes: to deter violators and deprive them of 'the fruits of their illegality,' and 'to compensate victims of antitrust violations for their injuries.'"

This reference by the Court to the compensatory rationale of § 4 was designed merely to emphasize its remedial function. *See Bruns-* *wick Corp. v. Pueblo Bowl-O-Mat, Inc., supra*, 429 U.S. at 485, 97 S.Ct. 690. The Court has repeatedly stressed as the general purpose of the antitrust laws the need to enhance competition. *See Hawaii v. Standard Oil Co., supra*, 405 U.S. at 262, 92 S.Ct. 885; *Brown Shoe Co. v. United States*, 370 U.S. 294, 344, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Apex Hosiery Co. v. Leader, supra*, 310 U.S. at 493, 60 S.Ct. 982.

III. *Antitrust Improvements Act of 1976.*

In 1976, Congress enacted the Hart-Scott-Rodino Antitrust Improvements Act. The new statute permits "State attorneys general to recovery monetary damages on behalf of State residents injured by violations of the antitrust laws." H.R.Rep.No.94–499, 94th Cong., 2d Sess. 3, *reprinted in* [1976] U.S.Code Cong. & Admin.News p. 2572. Congress intended in the new Act "to provide a remedy for injured consumers." *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 756–57, 97 S.Ct. 2061, 2080, 52 L.Ed.2d 707 (1977) (Brennan, J., dissenting). This Act represents a congressional response to the holding of *Hawaii v. Standard Oil Co., supra* (Clayton Act does not authorize a state to sue on behalf of its citizens for injury to its general economy). *See Illinois Brick Co. v. Illinois, supra,* 431 U.S. at 756, 97 S.Ct. 2061 (Brennan, J., dissenting).

According to the Act's legislative history, some members of Congress assumed, contrary to our construction of the statute, that ordinary consumers may currently sue for treble damages under section 4.[14] As the Supreme Court has noted, however, Congress made clear that the new legislation did not alter the definition of injured persons under section 4, *see Illinois Brick Co. v. Illinois, supra,* 431 U.S. 720 at 733–34 n. 14, 97 S.Ct. 2061, 52 L.Ed.2d 707, and the House Judiciary Committee acknowledged that the bill did not create new substantive liability. H.R.Rep.No.94–499, 94th Cong., 2d Sess. 9, *reprinted in* [1976] U.S.Code & Admin.News pp. 2572, 2578. "The views expressed by particular legislators * * * cannot * * * change the legislative intent [of section 4] * * * 'since the statements were [made] after passage of the [Clayton] Act.'" *Illinois Brick Co. v. Illinois, supra,* 431 U.S. at 733–34 n. 14, 97 S.Ct. at 2069.

In the House Report accompanying the bill, the Judiciary Committee noted:

The economic burden of many antitrust violations is borne in large measure by the consumer in the form of higher prices for his goods and services. * * *

Frequently, antitrust violations injure thousands or even millions of consumers, each in relatively small amounts. * *

Although the antitrust laws have the immediate goals of protecting and promoting competition, it is the consuming public that ultimately benefits from the enforcement of the antitrust laws. Nonetheless, Federal antitrust statutes do not presently provide effective redress for the injury inflicted upon consumers. * * * [This bill] fills this gap by providing the consumer an advocate in the enforcement process—his State attorney general. [H.R.Rep.No.94–499, 94th Cong., 2d Sess. 4, *reprinted in* [1976] U.S. Code Cong. & Admin.News pp. 2572, 2573–74.]

The Senate Judiciary Committee also noted that, in light of previously recognized judicial limitations, consumers had not been permitted to maintain antitrust actions.

[The new Act] is intended to assure that consumers are not precluded from the opportunity of proving the amount of their damage and to avoid problems with respect to [class action] manageability * * * *standing, privity, target area, remoteness, and the like.* [*Illinois Brick Co. v. Illinois, supra,* 431 U.S. at 757, 97 S.Ct. at 2080, *citing* S.Rep.No.94–803, 94th Cong., 2d Sess. 42 (1976) (emphasis in original).]

We think it significant that Congress, which sought to provide a meaningful remedy for consumers in the 1976 Act, did not seek to improve, clarify, or alter any existing private right of action for ordinary consumers. Congress did comment on the inappropriateness of the class action as a means of redressing consumers who pay higher prices because of anticompetitive activity. *See* H.R.Rep.No.94–499, 94th Cong., 2d Sess. 7, *reprinted in* [1976] U.S.Code Cong. & Admin.News pp. 2572, 2576–77.

---

14. *See, e. g.,* 122 Cong.Rec. 2065 (daily ed. Mar. 18, 1976) (remarks of Rep. Seiberling). *See generally* H.R.Rep.No.94–499, 94th Cong., 2d Sess. 3–9, *reprinted in* [1976] U.S.Code Cong. & Admin.News pp. 2572, 2572–78.

The goals and purposes of the antitrust laws may not be enhanced by permitting gigantic consumer class actions, many of which are never tried. In Handler & Blechman, *Antitrust and the Consumer Interest: The Fallacy of Parens Patriae and A Suggested New Approach*, 85 Yale L.J. 626, 627–30 (1976), the authors point out the failure, to date, of the class action vehicle to compensate aggrieved consumers. Judge Medina, of the Second Circuit, has noted: "not a single one of these class actions including millions of indiscriminate and unidentifiable members has ever been brought to trial and decided on the merits." *Eisen v. Carlisle & Jaquelin*, 479 F.2d 1005, 1018–19 (2d Cir. 1973), *aff'd*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).[15] Often, defendants who are unwilling or unable to defend such suits are compelled for economic reasons to settle actions otherwise meritless. The result of such settlements will inevitably be counterproductive when the costs to the defendant of defense and settlement are passed on to present and future consumers. Moreover, big firms are better able than small or medium-sized businesses to defend or settle such claims under similar circumstances. The ultimate result might be to preserve an oligopolistic economic climate. The deterrent impact of such suits, in our view, does not outweigh their potentially ruinous effect on American business. Deterrence exists in other antitrust remedies [16] as well as in the 1976 Act, which places responsibility for consumer actions upon state attorneys general. We agree with Congress that the new statute will effectively protect the interests of consumers without imposing upon the courts and the economy the risk and burden of nonmeritorious class actions.[17]

## IV. Conclusion.

█ In sum, the broad purposes of the Sherman and Clayton Acts were to provide an appropriate and *effective* remedy and to assure and protect competitive enterprise. The statutes primarily emphasized enforcement by businesses, particularly small businesses, against predators. We cannot ignore Congress' rejection of the broad language in the original Sherman Act in favor of the "business or property" limitation of the statute as enacted. We are also mindful of the congressional concern that consumers would be virtually without a remedy. We believe, in light of the statutory history, that Congress did not legislate in a vacuum. While the Act neither defines nor explains business or property, we think the overall purpose of the antitrust laws, to enhance competition, *see Hawaii v. Standard Oil Co., supra,* 405 U.S. at 262, 92 S.Ct. 885; *Brown Shoe Co. v. United States,* 370 U.S. 294, 344, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Apex Hosiery Co. v. Leader, supra,* 310 U.S. at 493, 60 S.Ct. 982, will best be served by requiring a commercial injury before a person may invoke the treble damage provisions of section 4.[18]

**15.** In our own circuit we have had an opportunity to review a grand scale antitrust class action in various contexts. *See United States v. Pfizer, Inc.,* 560 F.2d 323 (8th Cir. 1977); *United States v. Pfizer, Inc.,* 560 F.2d 319 (8th Cir. 1977); *Republic of Vietnam v. Pfizer, Inc.,* 556 F.2d 892 (8th Cir. 1977); *Pfizer, Inc. v. Government of India,* 550 F.2d 396 (8th Cir.), *aff'd en banc,* 550 F.2d 400 (1976), *aff'd,* 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978); *United States v. Lord,* 542 F.2d 719 (8th Cir. 1976); *Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180 (8th Cir. 1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977); *Pfizer, Inc. v. International Rectifier Corp.,* Nos. 75–1089 & 75–1187 (8th Cir. Mar. 26, 1975); *Pfizer, Inc. v. Lord,* 522 F.2d 612 (8th Cir. 1975), *cert. denied,* 424 U.S. 950, 96 S.Ct. 1421, 47 L.Ed.2d 356 (1976); *In re Fish & Neave,* 519 F.2d 116 (8th Cir. 1975); *Pfizer, Inc. v. International Rectifier Corp.,* No. 74–1425 (8th Cir. July 26, 1974); *Pfizer Inc. v. Lord,* 456 F.2d 545 (8th Cir. 1972); *Pfizer Inc. v. Lord,* 456 F.2d 532 (8th Cir.), *cert. denied,* 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972). It is our understanding that the merits in that case have never been fully litigated.

**16.** In addition to the new statute, the Justice Department's antitrust division as well as the Federal Trade Commission are empowered to combat anticompetitive activity.

**17.** We, of course, intimate no view on the merits of the present action.

**18.** Appellees argue that numerous consumer actions have been permitted by the courts,

For the foregoing reasons we think it sensible as a matter of policy and compelled as a matter of law that consumers alleging no injury of a commercial or competitive nature are not injured in their property under section 4 of the Clayton Act.[19]

Reversed.

## ORDER DENYING PETITION FOR REHEARING EN BANC

The petition for rehearing en banc in the above case is denied by four of the judges voting in favor of the denial. Three of the judges vote in favor of the rehearing en banc.

LAY, Circuit Judge, joined by HEANEY and STEPHENSON, would grant the petition for rehearing en banc for the following reasons:

The panel's decision denying standing to an individual consumer under § 4 of the Clayton Act, 15 U.S.C. § 15 (1976), is contrary to the rationale of *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906) and *Pfizer Inc. v. Government of India*, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). *See also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 485 n.10, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The decision is also contrary to several lower federal court decisions. *See Cleary v. Chalk,* 159 U.S. App.D.C. 415, 419, 488 F.2d 1315, 1319 n.17 (1973), *cert. denied,* 416 U.S. 938, 94 S.Ct. 1940, 40 L.Ed.2d 289 (1974); *Theophil v. Sheller-Globe Corp.,* 446 F.Supp. 131, 135 (E.D.N.Y.1978); *DeGregorio v. Segal,* 443 F.Supp. 1257, 1260–61 (E.D.Pa.1978); *In re Petroleum Products Antitrust Litigation,* 1977–2 Trade Cases (CCH) ¶ 61,639 (C.D. Cal. Sept. 16, 1977); *In re Ampicillin Antitrust Litigation,* 1977–1 Trade Cases (CCH) ¶ 61,434 (D.D.C. May 17, 1977). *See also* L. Sullivan, Antitrust 771 n.3 (1977). The denial of standing to an individual consumer reduces to a nullity the parens patriae provisions of the Antitrust Improvements Act of 1976, 15 U.S.C.A. §§ 15c–15h (Supp.1978), which authorize state attorneys general to bring actions on behalf of natural citizens for *nonbusiness* injuries.[1] We also join in the government's criticism contained in its amicus curiae brief in support of plaintiff's petition for rehearing:

> The panel opinion (sl. op. 18–19) appears to have been influenced significantly by the belief that consumer class actions seeking treble damages are anti-competitive. It asserts that such suits are meritless, yet exact unfair settlements from defendants, especially small businesses, that are unable to bear the costs of a defense. It thus concludes that any pro-competitive impact of these treble damage suits are outweighed by their entrenchment of large enterprises and their potentially ruinous effect on American small business. The panel's decision, however, reaches beyond its proffered concerns. It excludes all consumer treble damage actions brought under Section 4, not just class action suits. More importantly, it represents a policy judgment beyond the province of the judiciary. The courts are not free to interpret statutory language to support their views of wise economic policy. It is Congress' pol-

---

many to completion, without any discussion of consumer standing. For example, in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 92 S.Ct. 2004, 44 L.Ed.2d 572 (1975), purchasers of homes successfully attacked attorneys' use of minimum fee schedules. The Supreme Court, while noting that this type of activity harmed consumers, *id.* at 782, 92 S.Ct. 2004, did not specifically discuss consumer standing. *See also Fisher v. First National Bank of Omaha,* 548 F.2d 255 (8th Cir. 1977) (failing to address consumer standing, court dismissed action on other grounds).

In these cases, however, the issue was neither raised by the parties nor addressed by the courts; as such, it cannot be deemed to have been decided.

**19.** Appellee's complaint in the district court sought both monetary and injunctive relief. She is precluded by our decision from maintaining an action for treble damages under § 4. Her claim for injunctive relief, however, is not before us in this interlocutory appeal.

**1.** Subsequent legislation indicating the intent of an earlier statute is entitled to great weight in statutory construction. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

icy choice which must be implemented and the panel decision frustrates rather than effectuates the Congressional will. Brief for Government at 9–10.

For the foregoing reasons and those succinctly stated by Judge Larson in his memorandum opinion below, we would grant the petition for rehearing.