**TV SIGNAL CO. OF ABERDEEN,**
a corporation

v.

**AMERICAN TELEPHONE & TELEGRAPH CO., a corporation,**

and

**Northwestern Bell Telephone Co.,**
a corporation.

Civ. No. 70–6N.

United States District Court,
D. South Dakota.

Feb. 16, 1979.

Joseph M. Butler, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, S. D., Alan Raywid, Cole, Sylstra & Raywid, Washington, D. C., for plaintiff.

Harold C. Doyle, Sioux Falls, S. D., James Fitzmaurice, Faegre & Benson, Minneapolis, Minn., Donald R. Shultz, Lynn, Jackson, Shultz, Ireland & Lebrun, Rapid City, S. D., for defendants.

## MEMORANDUM OPINION

BOGUE, District Judge.

### BRIEF STATEMENT OF THE FACTS

The facts which precipitated this lawsuit are relatively simple. In April of 1969, in Aberdeen, South Dakota, TV Signal, a cable television company, sought to enter into a pole attachment agreement with Northwestern Bell. TV Signal desired to execute such an agreement in order to attach distribution cable for a community antenna television system (hereinafter CATV) to Northwestern Bell's telephone poles. At the time TV Signal made its initial request for a pole attachment agreement, Northwestern Bell had a one-per-pole policy. By this policy Northwestern Bell agreed that the first, and only the first CATV operator to have the necessary public authorization and to request a pole attachment agreement would be granted such a request. Because Northwestern Bell had already executed a pole attachment agreement with Aberdeen Cable TV Service, Inc., Northwestern Bell refused, pursuant to its one-per-pole policy, to enter into a pole attachment agreement with TV Signal.

As a consequence of Northwestern Bell's refusal to enter into the requested pole attachment agreement, TV Signal contracted with Anaconda Electronics Company to construct an underground CATV distribution system in Aberdeen. The installation of an underground system was considerably more costly but also offered some potential benefits which an all-aerial system would not have afforded, such as lower maintenance costs and the absence of annual pole rental fees. After Anaconda had constructed approximately 48.24 miles of the underground system, Northwestern Bell announced its decision to allow multiple pole attachments on its telephone poles. TV Signal completed its CATV system by attaching approximately 15.10 miles of its cable to Northwestern Bell's telephone poles.

In July of 1971, TV Signal sold its CATV system in Aberdeen to Aberdeen Cable TV. The gain which TV Signal realized by this sale exceeded $340,000.00. This is a brief sketch of the relevant facts which led to this controversy. This Court's findings of fact at the conclusion of this Memorandum Opinion and the Stipulation of Facts submitted by the parties, designated as Plaintiff's Exhibit Number 1772, set forth the background more fully.

TV Signal began this action in 1970 alleging, *inter alia*, violations of sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. Defendants moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The District Court granted the motion, which decision was reversed on appeal. *TV Signal Company of Aberdeen v. American Telephone and Telegraph Company*, 462 F.2d 1256 (8th Cir. 1972). Subsequent to the remand from the Eighth Circuit Court of Appeals, Defendants made several motions for summary judgment, all of which were denied. A court trial was held on the liability issue, which was bifurcated from the issue of damages.

This Court finds that the issue of the relevant product market under sections 1 and 2 of the Sherman Antitrust Act and standing under section 4 of the Clayton Act are dispositive of this case. Therefore, the Memorandum Opinion and the findings of fact and conclusions of law will be limited to these issues.

## I.

## APPLICABILITY OF RELEVANT MARKET

A. The Application of Relevant Market to Section 1 of the Sherman Antitrust Act.

■ Plaintiff contends Defendants violated both section 1 and section 2 of the Sherman Antitrust Act. In order to assess whether Defendants violated section 1 of the Sherman Antitrust Act this Court must determine whether "relevant market" is an essential element of Plaintiff's cause of action. A great deal of oral as well as written discussions has taken place concerning "relevant market." Plaintiff argues that the establishment of a relevant market is not essential to its section 1 cause of action. Defendants contend that in order to prevail in this particular action Plaintiff must establish such a market.

The applicability of relevant market to a violation of section 1 has been addressed by several courts. The United States Supreme Court, in the case of *United States v. Co-*

*lumbia Steel, Co.*, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948), discussed and then determined what constituted relevant market as it applied to a section 1 violation. In *Columbia, supra,* the United States claimed that an acquisition by the United States Steel Corporation of the largest independent steel fabricator on the west coast violated section 1 and section 2 of the Sherman Antitrust Act. Prior to holding that the acquisition of Consolidated Steel did not unreasonably restrict a competitor, the Court found it necessary to determine the relevant market. In *Columbia, supra,* the market for determining a section 1 violation was an *eleven-state* area in which Consolidated sold its product. The Supreme Court of the United States found it imperative to determine the relevant market before a finding as to a section 1 violation was made. Such an analysis by the United States Supreme Court indicates to this Court that a finding of relevant market must be made before it determines whether Defendants violated section 1 of the Sherman Antitrust Act.

The United States Court of Appeals for the Seventh Circuit has also reached the conclusion that relevant product market must be established before there can be a contract in restraint of trade. *American Aloe Corp. v. Aloe Cream Laboratories, Inc.*, 420 F.2d 1248, 1256 (7th Cir. 1970).

> Before there can be a conclusion as to whether there has been a substantial lessening of competition, monopolization, or a *contract in restraint* of trade, a determination must be made as to what are the relevant product markets within which to gauge a firm's power or the effect of its activities. (Emphasis added.)

Both the Second and Third Circuits are in agreement with the aforementioned cases on the question of applicability of relevant market to a section 1 violation. The Second Circuit, in the case of *Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286, 1292 (2nd Cir. 1974), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974), specifically held that Plaintiffs must establish a relevant market in order to prevail in its claim of a

section 1 violation. Judge Gibbons, in his well-reasoned opinion of *Martin B. Glauser Dodge Company v. Chrysler Corporation*, 570 F.2d 72, 81 (3rd Cir. 1977), set forth the elements that need be proved to sustain a cause of action under section 1 of the Sherman Act:

(1) That the defendants contracted, combined, or conspired among each other; (2) that the combination of conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

The ruling in the *Dodge* case indicates that relevant market is an element that Plaintiffs must prove in order to prevail in its claim of a section 1 violation.

The Eighth Circuit Court of Appeals has not specifically addressed the issue of whether relevant market is an element which must be proved by the Plaintiff to sustain a cause of action under section 1 of the Sherman Act. Plaintiff cites three Eighth Circuit cases which involve a section 1 violation. *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910 (8th Cir. 1976); *Reed Brothers, Inc. v. Monsanto Co.*, 525 F.2d 486 (8th Cir. 1975); and *Acme Precision Products, Inc. v. American Alloys Corp.*, 484 F.2d 1237 (8th Cir. 1973). Plaintiff contends that since the Eighth Circuit, in the above-entitled cases, dealt with section 1 violations without specifically looking at whether relevant market must be established by the Plaintiff, that relevant market need not be proven. This Court is not in the position of trying to determine why no discussion of relevant market was made by the Eighth Circuit in previous decisions. Perhaps that issue was not presented to the Court. On the basis of the Supreme Court's decision, as well as the above-enumerated decisions which specifically confront the issue, it is this Court's determination that the Plaintiff, TV Signal Company of Aberdeen, has the burden of proving relevant geographic and product market as a prerequisite to its prevailing

under section 1 of the Sherman Antitrust Act.

**B. Application of Relevant Market to Section 2 of the Sherman Antitrust Act.**

The Eighth Circuit Court of Appeals has ruled both in *TV Signal Company of Aberdeen v. American Telephone and Telegraph Company*, 462 F.2d 1256, 1260 (8th Cir. 1972) and *Acme Precision Products, Inc. v. American Alloys Corp., supra*, 1240 (8th Cir. 1973) that relevant market must be established by the plaintiff before a violation of section 2 of the Sherman Antitrust Act can be confirmed. The Court in *Acme* held:

That regardless of the particular charge, i. e., "monopolization" or "attempt to monopolize," proof of a relevant market is still a prerequisite for establishing a § 2 violation.

The United States Supreme Court in *United States v. E. I. DuPont DeNemours & Co.*, 351 U.S. 377, 380–381, 76 S.Ct. 994, 999, 100 L.Ed. 1264 (1956), discussed at length the application of relevant market to alleged violations of section 2 of the Sherman Act. The Court held that relevant market is an essential element to a section 2 violation. Finally, it should be noted that Plaintiff agrees relevant market must be shown in order to prevail in its cause of action involving section 2 of the Sherman Antitrust Act.

Therefore, in order for Plaintiff to prevail under either section 1 or section 2 of the Sherman Act, relevant market must be proven. The burden of proving relevant market falls on the claimant. *Acme Precision Products, Inc. v. American Alloys Corp., supra*, 1242 (8th Cir. 1973).

## II.

### RELEVANT PRODUCT MARKET

Relevant market is two-pronged. The Plaintiff must establish that American Telephone & Telegraph, Northwestern Bell and TV Signal Company of Aberdeen were involved in the same geographic and product market. *Morton Buildings of Nebraska,*

*Inc. v. Morton Buildings, Inc.*, 531 F.2d 910, 918 (8th Cir. 1976).

The United States Supreme Court in *United States v. E. I. DuPont DeNemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) defined product market:

> In considering what is the relevant market for determining the control of price [in] competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of the trade or commerce," monopolization of which may be illegal. 76 S.Ct. 994 at 1007.
>
> The "market" which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered. 76 S.Ct. 994 at 1012.

This definition of relevant product market was adopted by the Eighth Circuit in *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., supra*, at 918.

A working definition of relevant product market was provided by the Supreme Court in *Brown Shoe Company v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962):

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.

A definition of relevant product market cannot be obtained unless focus is made on particular services and actual commercial transactions between buyers and sellers. *American Medicorp., Inc. v. Humana, Inc.*, 445 F.Supp. 589, 597–603 (E.D.Pa.1977). The Seventh Circuit, in *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir. 1977) stated:

> [A] market definition "which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful." *Cass Student Advertising, Inc. v.*

*National Educational Advertising Service, Inc., supra* [7 Cir.], 516 F.2d 1092 at 1095, quoting from *L. G. Balfour Co. v. F. T. C., supra*, 7 Cir., 442 F.2d 1 at 11, which in turn quotes from *United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 592 (S.D.N.Y.1958).

Plaintiff is contending that the alleged product market is the "communications market." Defendants feel there is no relevant product market or submarkets and strenuously object to Plaintiff's contention that the relevant product market is the "communication" business.

The Eighth Circuit, in *TV Signal v. American Telephone & Telegraph Co.*, 462 F.2d 1256, at 1261, made reference to the fact that plaintiff and defendants are both in the "communications" business. Plaintiff has repeatedly cited this observation and apparently places a great deal of importance on it. The statement by Judge Breitenstein is not a determination of the product market. That opinion, relied on by the Plaintiff, was in response to a motion to dismiss. The Court was merely pointing out that the threat of potential competition was sufficiently alleged. It did not determine or even attempt to determine, what constituted the relevant product market. This District Court, after receiving all the evidence which included five weeks of testimony, with reams of exhibits, has the duty of determining the relevant product market. Without this evidence, no court could resolve the dispute over what constitutes the relevant product market.

It was never established to this Court that the Plaintiff and Defendants were operating within the same relevant product market or submarket. At no time did Plaintiff and Defendants provide the same or reasonably interchangeable services to customers in Aberdeen or the surrounding South Dakota towns.

Plaintiff offered, as a product, basic CATV services consisting of the carriage of broadcast television signals, automated time-weather service, and limited locally originated programming. Plaintiff also

projected certain expansion to its business. Evidence was received by this Court indicating a possible intent by the Plaintiff to provide certain broadband services referred to as "blue-sky" services.

Defendants, on the other hand, have never engaged in the provision of CATV services anywhere in South Dakota. Defendants provide telephone service to most South Dakota cities. At one time Defendants considered investing and marketing "broadband services." This, however, did not and never has occurred. No actual competition between the Plaintiff and Defendants ever materialized. Defendant did not provide cable TV services in South Dakota. Plaintiff, of course did not attempt to provide telephone services.

The only possible competition between TV Signal and American Telephone and Telegraph and Northwestern Bell concerns so-called "projected" services. There are, however, a number of facts which tend to repudiate Plaintiff's claim of competition of projected services with the Defendants. First, there was a lack of intent on the part of the Plaintiff to engage in broadband services in the near future. No preparatory steps such as market studies to determine demand or cost/revenue analysis were done by the Plaintiff. Neither the articles of incorporation nor its stock offering referred to anything other than a cable television system. The ordinances obtained in Aberdeen, Pierre, Redfield, Webster and other South Dakota cities only refer to CATV (no language about broadband services). In fact, the ordinance obtained in Aberdeen specifically prohibited pay TV and was restricted to:

> Only television and radio signals which are disseminated to the general public without charge by broadcasting stations . . . except that [licensee] shall have the right to originate signals conveying the weather, time and public service information only, for its subscribers, for which no special charge shall be made.

No application to either the South Dakota Public Utilities Commission or the Federal Communications Commission was ever

made by the Plaintiff. Additional equipment was necessary to provide the type of service contended by the Plaintiff. This equipment would have been very expensive. It appears unlikely that the Plaintiff could have financed such a costly endeavor.

Even if both the Plaintiff and the Defendants had the intent to enter the field of broadband services here in South Dakota, such services never materialized. Hindsight has provided this Court with twenty-twenty vision concerning the broadband market since this alleged infraction of the antitrust laws. Since 1969 this dream of "blue-sky" services has not crystallized. Plaintiff cannot establish a relevant market or submarket by setting forth projected services that were merely in the minds of both parties. This Court cannot rule that the Defendants violated section 1 and section 2 of the Sherman Antitrust Act without a finding that relevant product market existed. In this instance, there is no relevant product market in which the Plaintiff and Defendants competed. Therefore, Defendants' policy of one attachment per pole did not violate section 1 or section 2 of the Sherman Antitrust Act.

### III.

### RELEVANT GEOGRAPHIC MARKET

Relevant geographic market was defined by the Eighth Circuit Court of Appeals in *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., supra,* 918:

> The geographic market encompasses the area in which the defendant effectively competes with other individuals or businesses for the distribution of the relevant product. *Otter Tail Power Company v. United States,* 410 U.S. 366, 369, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359, 363 (1973); *United States v. Grinnell, Corp., supra,* 384 U.S. [563] at 575–76, 86 S.Ct. [1698] at 1706, 16 L.Ed.2d [778] at 788–789, *aff'd,* except as to decree, 236 F.Supp. 244 (D.R.I.1964); *Case-Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449, 455–56 (9th Cir. 1966), rev'd on other grounds, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967).

TV Signal contends the geographic market consists of "the aggregate of towns in which TV Signal sought presently or had taken concrete steps evidencing an intent and preparedness in the future, to compete for the right to serve." TV Signal, in addition to Aberdeen, obtained operational franchises in four other South Dakota cities, those being Pierre, Redfield, Webster and Miller. It is those towns which the Plaintiff, TV Signal, claims make up the relevant geographic market and submarkets.

It is the Defendants' contention that there is no geographic market in this antitrust action because Plaintiff and Defendants did not compete anywhere with respect to any product or any service. In the alternative, the Defendants argue the relevant geographic market is Aberdeen, South Dakota—the only location in which Plaintiff actually conducted CATV operations and supplied consumers with any services.

Whether this Court accepts the Plaintiff's argument of Aberdeen, Pierre, Redfield, and Miller, or Defendants' argument of simply Aberdeen as the relevant geographic market is of little importance. It is this Court's opinion that Plaintiff failed to prove Defendants effectively competed with Plaintiff for distribution of its product in either Aberdeen or the other surrounding towns.

## IV.

### STANDING

In order for Plaintiff to maintain this cause of action successfully against these Defendants, Plaintiff must prove by a preponderance of the evidence that it has standing to sue under section 4 of the Clayton Act. That section (15 U.S.C. § 15) reads in pertinent part as follows:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides . . . . .

The potentially broad sweep of the statute, and the accompanying necessity of impos-

ing some additional restrictions upon a party's standing to sue, have long been recognized by the courts. As the Court of Appeals for the Ninth Circuit stated about section 4 in *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 125 (9th Cir. 1973), *cert. denied sub nom., Morgan v. Automobile Manufacturers Ass'n, Inc.*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), *reh. denied sub nom., Morgan v. Automobile Manufacturers Ass'n, Inc.*, 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 104 (1974):

Read literally, this statute could afford relief to all persons whose injuries are causally related to an antitrust violation. Recognizing the nearly limitless possibilities of such an interpretation, however, the judiciary quickly brushed aside this construction. Instead, a measured approach has prevailed; courts have impressed a standing doctrine so as to confine the availability of section 4 relief only to those individuals whose protection is the fundamental purpose of the antitrust laws.

Judicial limitations placed upon the expansive language of section 4 require that Plaintiff do more than establish that it had a business or property interest which was damaged by Defendants' conduct. Rather, Plaintiff must satisfy three requirements in order to have standing to sue under section 4. First, Plaintiff must show that the business or property which was allegedly damaged by Defendants' conduct fell within the same sector of the economy as Defendants' business or property. In other words, Plaintiff and Defendants must have been competing within the same relevant market in order for Plaintiff to have standing to sue under section 4 of the Clayton Act. See, *e. g., In re Multidistrict Vehicle Air Pollution M.D.L. No. 31 v. Automobile Manufacturers Ass'n, Inc., supra*, 126 and 129, note 11; *GAF Corp. v. Circle Floor Co.*, 463 F.2d 752, 758 (2nd Cir. 1972), *cert. dismissed*, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973). Secondly, Plaintiff must demonstrate that it suffered actual pecuniary damage to its business or proper-

ty. *See, e. g. American Infra-Red Radiant Co. v. Lambert Industries, Inc.,* 360 F.2d 977, 995-96 (8th Cir. 1966), *cert. denied,* 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966), and *McCleneghan v. Union Stock Yards of Omaha,* 349 F.2d 53, 57 (8th Cir. 1965). Finally, in order to establish its standing under section 4, Plaintiff must prove that the injury suffered was proximately caused by conduct prohibited by the antitrust laws. *See, e. g., Multidistrict Vehicle Air Pollution M.D.L. No. 31 v. Automobile Manufacturers Ass'n, Inc., supra,* 126.

### A. Business or Property Within the Meaning of Section 4 of the Clayton Act

Plaintiff must establish that it both intended to, and was actually prepared to, expand its business to provide services which would have been in competition with those offered or contemplated by these defendants. If Plaintiff's business was in no way in competition with or in impending competition with the business of Defendants, Plaintiff's alleged injury would not be the type of injury against which the antitrust laws were designed to protect. As the district court for the Eastern District of Arkansas, Western Division stated:

> The Supreme Court of the United States has emphasized that in determining who may sue under the antitrust laws, the central inquiry is one of *competitive injury. Perkins v. Standard Oil,* 395 U.S. 642, 648-49, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969). Since the purpose of the antitrust laws is the "prevention of restraints to free competition in business and commercial transactions," *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940), it follows that only those persons injured in their competitive positions in a business in which they are engaged should be permitted standing to sue under the Clayton Act. . . ." *Ragar v. J. T. Raney & Sons,* 388 F.Supp. 1184, 1187 (E.D.Ark.W.D. 1975) affd., 521 F.2d 795 (8th Cir. 1975) (*per curiam*).

See also, *Reiter v. Sonotone Corp.,* 579 F.2d 1077, 1081-1084 (8th Cir. 1978), *reh. en banc*

denied, 1978, cert. granted, —— U.S. ——, 99 S.Ct. 830, 59 L.Ed.2d 30 (1979).

Under these circumstances, to succeed in demonstrating standing to sue, Plaintiff has to show that it had taken some overt and practical steps to expand its operations beyond the offering of conventional CATV services. As the district court stated in *N. W. Controls, Inc. v. Outboard Marine Corp.,* 333 F.Supp. 493, 507 (D.Del.1971):

> A simple hope or expectation to enter a business is clearly insufficient. . . . A mere subjective intent . . . to expand an already existing business is not enough on which to base standing to sue, there must be *overt* and *objective* preparations. (Emphasis added.)

There is little evidence of any intent on the part of CATV to expand its services beyond the realm of conventional CATV services. The only substantial evidence of any intent to expand was offered by Mr. H. I. King who testified that he was interested in constructing a CATV system in Aberdeen so that he "would be ready for anything that developed along the industry." Such an amorphous expression of aspirations for the future simply does not constitute sufficient evidence of an intent to expand the services offered by TV Signal beyond those comprising traditional CATV services to satisfy the standing requirements.

An additional and notable lack of intent to expand from conventional CATV services into "blue-sky" or broadband services is evidenced by the lack of any legal authority on the part of TV Signal to extend its operations beyond conventional CATV services. As this matter has been discussed at length in the portion of this Memorandum Opinion dealing with the definition of relevant market and submarket under sections 1 and 2 of the Sherman Act, the matter will not be further considered here.

Plaintiff also failed to demonstrate that it had the physical ability to expand into the area of "blue-sky" or broadband services. Although Plaintiff concedes that it did not have the ability to offer "blue-sky" or broadband services, Plaintiff contends

that entry into the broader market would have been the obvious result of natural expansion in the industry. As the Sixth Circuit Court of Appeals stated in *Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383, 395–96 (6th Cir. 1962) concerning a plaintiff's claimed intention to expand in its business:

> The trial judge rejected the claim for damages on these items for the reason that the proof showed that the plaintiff never had the capacity to produce them, in that it had not installed the plant facilities required for their manufacture.
>
> We think the trial judge was correct in his ruling. There was only a *stated intention to enter* into this additional production with *no overt act* performed in connection therewith and *no expenditure of money* to provide the required facilities. Preparedness and capacity to engage in a business mean more than an intention so to do and an ability to buy the necessary facilities. (Emphasis added.)

Such an approach makes sense as the antitrust laws were not enacted to protect dreamers from those having competitive dreams.

Plaintiff has strenuously argued that Plaintiff and Defendants were in competition in the area of broadband services. Rather than pointing to overt acts or signs that TV Signal or any other traditional CATV operator was in the process of expanding into the area of broadband or "blue-sky" services, Plaintiff continues to point to Defendants' internal documents which reveal that at one point in Defendants' history, Defendants may have perceived traditional CATV operators as prospective competitors in the area of broadband services. Plaintiff expressed no specific intention to enter the field of broadband services, and was not physically or economically prepared to do so. Consequently, Defendants' premature and somewhat paranoid perceptions of traditional CATV operators as potential competitors in a product market into which neither CATV operators nor defendants has yet entered in the relevant geographic market, are insuffi-cient to demonstrate that Plaintiff was in competition with Defendants. There having been no competition, no competitive injury was possible.

### B. The Alleged Injury

Plaintiff's claim of injury is simple and concrete. Plaintiff first points to the undisputed facts that TV Signal applied for a pole attachment agreement in Aberdeen, South Dakota and that Northwestern Bell initially declined to enter into such an agreement. As a direct consequence of Northwestern Bell's refusal to enter into such an agreement, Plaintiff was forced to develop a predominantly underground system which cost more to install than an all-aerial system. There is no disagreement as to these facts. There is fundamental disagreement as to the legal significance of these facts.

Plaintiff's reconstruction of the scenario and concomitant assertion of injury is predicated upon Plaintiff's belief that Defendants' refusal to enter into a pole attachment agreement constituted a violation of the antitrust laws. As this Court has already found that there was no area of effective competition between Plaintiff and Defendants, any proof relating to injury is irrelevant to a cause of action under the antitrust laws. Even assuming, *arguendo*, that Defendants' denial of the requested pole attachment agreement was a violation of the antitrust laws, Plaintiff failed to prove that it was injured by Defendants' decision to deny it a pole attachment agreement and consequently cannot establish its standing to sue under section 4.

The statutory language of section 4 itself makes clear that proof of a violation of the antitrust laws alone does not entitle a private litigant to damages. Rather, the private litigant must prove that it was injured by the violation. Plaintiff has argued that in bifurcated trials such as this one, where the issue of liability is separated from the issue of the amount of damages, the requirement of showing the fact of injury is diminished. Plaintiff cites cases such as *In*

re *Master Key Antitrust Litigation*, 70 F.R.D. 23, 26, n. 3 (D.Conn.1975), appeal dismissed, 528 F.2d 5 (2nd Cir. 1975), and *Richfield Oil Corp. v. Karseal Corp.*, 271 F.2d 709, 713 (9th Cir. 1959), *cert. denied*, 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960) as support for this proposition. These cases are distinguishable because they both involve situations where the courts found the antitrust violations to be readily apparent and consequently did not stringently insist upon proof on the issues of fact of injury or proximate cause. As this Court has not found any such clear violation of the antitrust laws, there seems to be no similar rationale for lessening Plaintiff's burden on either the fact of injury or proximate cause. Instead, this Court will apply the long-standing requirement that the Plaintiff must prove the fact of damage by a preponderance of the evidence.

Once a Plaintiff has proved an antitrust violation and the fact of damage, a lesser quantum of proof may be required to prove the amount of damages. As the United States Supreme Court stated in *Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931):

> [T]here was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner has sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.

As the case at bar does not involve the amount of damages, and as this Court has found that even the threshold requirements of an antitrust violation have not been met, Plaintiff must meet its burden of proof on proving the fact of damage.

While Plaintiff did incur $64,800.00 additional expenses in higher initial construction costs, Plaintiff has failed to rebut in any way Defendants' evidence concerning the benefits which an underground system afforded. Plaintiff would not have had any annual pole rental to pay had it completed and maintained the underground system. Plaintiff would have had reduced maintenance costs with an underground system rather than an all-aerial system. Furthermore, Plaintiff was assured an earlier starting date by Anaconda which would have also helped to offset the initially higher construction costs. The combination of these factors would have resulted in the complete offset of the initially higher construction costs within a two-year period. Finally, Plaintiff has failed to explain how it was economically injured when it was able to sell its CATV business at a $340,-000.00 gain.

### C. Proximate Cause

In addition to proving the fact of injury, Plaintiff was required to prove that the injury, if any, was proximately caused by Defendants' illegal conduct. *See, e. g.*, *Duff v. Kansas City Star Co.*, 299 F.2d 320, 322 (8th Cir. 1962). For Plaintiff to have sustained its burden of proof as to proximate cause in this case, Plaintiff needed to prove that Defendants' refusal to enter into a pole attachment agreement proximately caused Plaintiff's failure to expand into an area of services which would have been competitive with those offered by Defendants. To establish proximate cause, Plaintiff needed to prove that its decision to sell was caused by Defendants' initial refusal to enter into a pole attachment agreement.

Plaintiff did not prove that it was forced to sell its CATV business because of Defendants' refusal to enter into a pole attachment agreement with Plaintiff. It seems that the proximate cause of Plaintiff's "forced" sale was Plaintiff's undercapitalization or, alternatively, the lure of an attractive sale price.

Assuming, *arguendo*, that Plaintiff had proved that it was forced to sell its CATV

business because of Defendants' initial refusal to enter into a pole attachment agreement, there remains a complete absence of evidence that this refusal resulted in Plaintiff's inability to enter into the area of "blue-sky" or broadband services. As the field of "blue-sky" or broadband services has simply not developed to the extent that Plaintiff anticipated it would develop when this lawsuit was commenced, it is difficult for this Court to connect Plaintiff's failure to enter into the field to Defendants' refusal to enter into a pole attachment agreement with Plaintiff. The natural expansion of CATV suppliers into the area of broadband or "blue-sky" services has not occurred. Therefore, the economic realities of the '70s, rather than Defendant Northwestern Bell's initial refusal to enter into a pole attachment agreement with Plaintiff, have proximately caused the reduction in interest and development of broadband or "blue-sky" services by CATV operators across the nation. Consequently, Plaintiff's expectation of earning profits from the allegedly competitive services was not reasonable.

## FINDINGS OF FACT

The following findings of fact are the trial Court's findings, and notwithstanding occasional similarity between the Court's findings and the findings proposed by the parties hereto, careful reading will reveal them to be the product of the independent thought of the Court.

A.   Relevant Market

1.   As a supplement to commercial television broadcasting, the cable television industry, sometimes referred to as community antenna television or CATV, originated in the late 1940s and early 1950s.

2.   The basic nature and function of CATV remains today substantially the same as when the industry began in the 1950s—providing entertainment/informational programming not available free from the standard broadcast sources for a fee to all or substantially all of the system's subscribers.

3.   The American Telephone and Telegraph is a corporation managed by its Board of Directors. American Telephone and Telegraph is organized under the laws of the State of New York, with its principal place of business at 195 Broadway, New York, New York.

4.   American Telephone and Telegraph, the operating companies, Western Electric, and Bell Laboratories operate as a unitary enterprise with the common purpose of providing an integrated nationwide telecommunications network.

5.   Northwestern Bell is a corporation organized under the laws of the State of Iowa, with its principal place of business at 100 South 19th Street, Omaha, Nebraska. Northwestern Bell is simply one subsidiary in the American Telephone and Telegraph system. The states of South Dakota, North Dakota, Minnesota, Iowa and Nebraska are serviced by Northwestern Bell. None of the Bell system companies has ever engaged in the business of providing CATV service directly to customers.

6.   In about 1950, some of the Bell systems operating companies received requests from CATV operators to provide a means for transmitting CATV signals, either by providing some form of private line transmission service or by allowing the attachment of CATV cable and equipment to utility poles. These operating companies referred the request to American Telephone and Telegraph for advice. In 1951 it was recommended by American Telephone and Telegraph that the operating companies begin to permit CATV operators to attach their cable and equipment to telephone company poles, subject to the limitation that only one operator be permitted to attach to a given pole.

7.   Prior to 1951, the Bell system companies followed a general policy of permitting attachments to their poles only by regulated public utilities and for certain public safety governmental purposes, such as police and fire alarms. Therefore, the decision to permit CATV attachments to the poles represented a departure from prior Bell system policy.

8. On March 15, 1969, Aberdeen Cable, the first cable TV outfit in Aberdeen, entered into a pole attachment agreement for Aberdeen with Northwestern Bell.

9. On April 8, 1969, an initiated ordinance was passed, granting "H. I. King, d/b/a TV Signal Company of Aberdeen", the right to construct and operate a CATV system in Aberdeen. In June of 1969, King and his family formed a corporation—"TV Signal Company of Aberdeen." Hereafter, the proprietorship and the corporation were referred to as "TV Signal".

10. By April, 1969, there were two companies to whom CATV ordinances had been issued in Aberdeen.

11. More than three weeks after Aberdeen cable had entered into a pole attachment agreement with Northwestern Bell, H. I. King sent a telegram to Northwestern Bell applying for either a pole attachment agreement or CATV channel service. Northwestern Bell refused King's request for a pole attachment agreement because of its policy limiting CATV pole attachments to one per pole. Northwestern Bell did offer to fill his request for channel service, estimating that such service could be operational approximately 32 to 40 weeks after required FFC authorization was received.

12. TV Signal began discussions with Anaconda Electronics Company for the construction of a CATV distribution system. These discussions were concerned with the construction of an underground system. Testimony indicated that the speed of construction was TV Signal's primary consideration. TV Signal and Anaconda entered into a contract for the construction of a seventy-mile underground CATV distribution system in Aberdeen. The parties agreed to a price of $5,000 per mile of cable. They further agreed to furnish and install head-in electronic equipment and directional taps to accommodate 4,000 house drops for a fee of $50,000. The contract was later amended in July of 1969 resulting in the increase of the estimated price of the latter section to $96,635. The contract called for substantial completion of construction by September 1, 1969.

13. Anaconda failed to meet the September 1 deadline established by the contract. This delay was not caused by the Defendants.

14. On October 27, 1969, Richard Hicks, the Northwestern Bell employee having primary CATV responsibility in South Dakota, learned that the one-per-pole policy had been abandoned and that multiple CATV attachments would be permitted. TV Signal was advised of this change of policy. A formal agreement was provided to TV Signal on December 4, 1969, signed by it on the same day, and approved by Northwestern Bell on December 31, 1969.

15. After TV Signal obtained a pole attachment agreement, nearly all of its construction for CATV was aerial. The completed system was formally accepted by TV Signal on July 3, 1970. The system included 48.24 miles of underground cable and 15.1 miles of aerial cable.

16. An agreement was entered into on June 18, 1971, in which TV Signal agreed to sell substantially all of its assets to Aberdeen Cable for a purchase price of $1,175,-000. TV Signal's own financial statements indicate that this sale resulted in a gain to the corporation of over $340,000, which was tax free because of the corporation's subsequent dissolution. Shareholders of TV Signal, upon its dissolution, realized a return of over 238 percent of their average investment over 26 months, or 114 percent annual return. The corporation, TV Signal, was dissolved on July 7, 1972. The trust for the benefit of TV Signal's common shareholders was dissolved on July 1, 1974.

17. At no point did Plaintiff and Defendants provide the same or reasonably interchangeable services to customers in Aberdeen. TV Signal offered basic CATV services, consisting of the carrying of broadcast television signals, automated time—weather service, and limited locally-originated programming to the premises of its subscribers. This was the only service TV Signal ever provided. Defendants never provided CATV services in Aberdeen or anywhere in South Dakota. Defendants

merely provided the people of Aberdeen with basic telephone service and certain limited intra-city common carrier private line services, including low-speed telemetering and alarm channels for the remote control of private mobile radio systems, voice grade private lines and probably some voice grade data private line.

18. The Bell system and the CATV operators never competed anywhere in the nation with respect to their basic service offerings—basic telephone services, on one hand and CATV services, on the other. The Bell system's offering of CATV channel service is distinguishable from the CATV service offered by CATV operators.

19. CATV operators have never provided basic telephone services. There are fundamental differences in purpose and design between the telephone network and a CATV network.

20. There are four categories of service which could be provided over a CATV system:

(1) Two-way switch services;

(2) Two-way nonswitch services, including meter reading, two-way data services, medical alerts, security and fire alarm service, and various forms of information retrieval;

(3) One-way, nonbroadcast services, including one-way data, stockmarket quotations, and one-way facsimile; and

(4) One-way and "limited two-way" broadcast services, including pay TV and certain variety closed circuit TV service such as educational TV and industrial TV.

21. The one-way nonbroadcast services, the add-on services, and the two-way services, both switched and nonswitched, with the exception of pay TV are sometimes referred to collectively as "blue-sky" services. These services were not demanded anywhere in the nation in 1969–1970, nor were they economically feasible.

22. Some experiments with these services over the cable television system were done after 1970. These experiments were terminated after a short period of time. "Blue-sky" services generally have not been realized and there is no evidence that any of these services are yet being provided on a commercially successful basis. Many of these services were not feasible "from an economic viewpoint" even as late as 1978.

23. Plaintiff failed to establish that any commercially viable market existed in 1969 for any of the "blue-sky" services which it claims it intended to offer. No such market has developed since that time. Specifically, the evidence reveals that:

(a) Meter reading was not feasible for a system like TV Signal's in 1969 and it is prohibitably expensive to offer today.

(b) Stockmarket quotations are a service with a limited audience which a CATV operator probably would not have been interested in offering in Aberdeen in 1969.

(c) As of 1969, burglar and fire alarm services were not feasible for any CATV system. There is no evidence that these services are now being offered on a commercially viable basis.

(d) Experiments with at-home shopping in the mid-1970s demonstrated that it had little or no market appeal.

(e) No CATV operator provided any type of data service, either one or two-way in 1969; two-way data transmission was not offered by any CATV operator as recently as 1973 and even today is offered only in Manhattan, New York, to a single customer, a large bank. It is unlikely that any demand for such service will exist in smaller communities, such as Aberdeen, for many years to come.

(f) Full two-way television, involving television transmission from each subscriber's premises has never been practical.

24. The surviving CATV system in Aberdeen today offers only broadcast type programming, including traditional television and radio signals, automated news and weather channels and occasional locally-

originated film programs. CATV is the only additional service which could be offered in Aberdeen in the foreseeable future.

25. In retrospect, claims in the 1960s that a viable commercial market was imminent for the "blue-sky" services were speculative and unrealistic.

26. The Bell system's one-per-pole policy had no effect on the development of the "blue-sky" services.

27. Defendants and Plaintiff did not compete in the offering of "add-on" services such as pay TV, ETV and ITV.

28. Pay TV was offered by CATV operators only on an experimental basis as late as 1973. It has generally become economically feasible to offer pay TV service only within the last two or three years. Services such as "add-on" "private channel" programming were offered by CATV operators on an experimental basis as late as 1973. Presently CATV provision of such services is minimal. There is little market demand for CATV systems to provide such services.

29. Construction and operation of facilities for others to provide pay TV and ITV or intra-city ETV anywhere in South Dakota by either American Telephone and Telegraph or Northwestern Bell have never transpired. Northwestern Bell's telephone plan would be totally unsuited to the provision of acceptable quality video transmission service. Northwestern Bell has never had in the City of Aberdeen any intra-city coaxial cable facilities.

30. Plaintiff did not establish that it provided any service that was the same or reasonably interchangeable with any service provided by the Defendants in Aberdeen or elsewhere in South Dakota. No market exists in which both Plaintiff and Defendants competed, involving construction, maintenance and/or financing of CATV facilities.

31. TV Signal did not build or offer to build a CATV distribution system for anyone other than itself. Its distribution system was not available for use by anyone other than itself. TV Signal did not transmit or offer to transmit signals provided by anyone other than itself over its distribution system.

32. Neither Plaintiff, nor Defendants provided or offered to provide a commercial service of maintaining CATV facilities owned and operated by another.

33. The only town in which TV Signal actually constructed and operated a CATV system was Aberdeen, South Dakota.

34. Plaintiff contends that the relevant geographic market includes Pierre, Redfield, Miller, Webster and Aberdeen, South Dakota. No actual construction of CATV facilities was made in any South Dakota town other than Aberdeen, South Dakota.

35. The Bell system's one-per-pole policy was abandoned in October of 1969.

**B. Standing Under Section 4 of the Clayton Act**

1. The only substantial expression of any intent to expand beyond basic CATV services came from H. I. King who stated that one of his reasons for constructing a CATV system in Aberdeen was to be "ready for anything that developed along the industry."

2. There was minimal evidence of any intent on the part of TV Signal to engage in any business other than CATV and no evidence that any of the preparatory steps that a prudent businessman interested in providing new services in a potential new market would be expected to take were taken by TV Signal.

3. Neither TV Signal's Articles of Incorporation nor its stock offering circular reflects any intention to engage in any business other than CATV.

4. None of the ordinances obtained or sought by TV Signal or H. I. King in Aberdeen or elsewhere in South Dakota referred to the provision of any service other than broadcast TV and radio signals and locally originated time, weather and public service information, the latter to be provided at no special charge to the subscriber.

5. There is no evidence that TV Signal ever made application for a certificate of

convenience and necessity from the South Dakota Public Utilities Commission (PUC) in order to construct and operate its facilities as a telephone company or any other type of communications service.

6. There is no evidence that Plaintiff ever sought or was granted authority from the Federal Communications Commission under section 214 of the Communications Act of 1934 (47 U.S.C. § 214) to construct and operate facilities either for CATV channel service or as an interstate communications common carrier generally.

7. The CATV system developed by TV Signal in Aberdeen did not have the excess channel capacity which would have been needed to provide any additional services nor was it technically equipped to provide services other than traditional CATV services.

8. Conversion of TV Signal's system to one which would have had the channel capacity to provide 20 channels of service would have required additional equipment and the replacement of existing equipment.

9. There is no evidence that TV Signal either purchased or acquired the equipment which would have been necessary to convert its existing system to a 20 channel capacity.

10. TV Signal did not offer pay TV nor was it equipped to provide pay TV. Furthermore, there is no evidence that it had entered into any negotiations to acquire the expensive equipment and material which would have been necessary for it to offer pay TV.

11. TV Signal did not and, as constructed, could not provide intra-city closed-circuit ETV or ITV services. Substantial additional equipment would have been necessary for these services to have been offered and there is no evidence that TV Signal either acquired or entered into negotiations to obtain any of the necessary equipment.

12. TV Signal did not provide fire alarm, security alarm or medical alert services. A substantial amount of costly additional equipment would have been necessary to provide these services. There is no evidence that TV Signal either acquired or entered into negotiations to obtain the additional equipment which would have been necessary to provide these services.

13. TV Signal did not have the capacity to provide meter reading services. Plaintiff would have had to make a substantial investment in additional equipment in order to provide this service. There is no evidence that Plaintiff ever acquired or entered into negotiations to purchase the equipment necessary to provide this service.

14. The predominantly underground system constructed by TV Signal was not an obstacle to the development of any of the foregoing services. The modifications required to develop these additional services would have been slightly less expensive because the majority of the system was underground.

15. There is no evidence that TV Signal took any steps to prepare to provide two-way video services.

16. The construction and operation by TV Signal of a standard house-to-house CATV system does not, without additional objective evidence, reflect either the intent or preparation to expand its services beyond a standard house-to-house CATV system.

17. TV Signal lacked the financial resources to expand into services other than the traditional CATV services which it was equipped to provide.

18. TV Signal had incurred obligations exceeding $900,000 and had less than $400,000 of available funds to pay those obligations; TV Signal was therefore undercapitalized to construct and operate either an all-aerial or an underground system.

19. TV Signal's undercapitalization was not caused by Northwestern Bell's initial refusal to enter into a pole attachment agreement.

20. The lack of any evidence that there was a market for "blue-sky" services in either Aberdeen or the aggregate of South Dakota communities which Plaintiff claims constitutes the geographic market negates the possibility of proving damages to any business in such a market.

21. Although it did cost Plaintiff $1,350 more per mile to construct the underground segments of the CATV system constructed by Plaintiff than the aerial segments, there were offsetting financial benefits to an underground system.

22. The offsetting financial benefits included the avoidance of annual pole rentals, an earlier possible starting date and the avoidance of pole make-ready costs.

23. Because of these offsetting financial benefits, there were no material differences in projected return of investment between the aerial and the underground alternatives.

24. Any failure by Plaintiff to recoup the higher initial costs of the underground portion of its system was caused by actions of persons other than the Defendants.

25. There is no evidence that Northwestern Bell's initial refusal to enter into a pole attachment agreement was in any way responsible for TV Signal's failure to expand its services beyond traditional CATV services.

26. TV Signal was not forced to sell its business because of any action of Defendants.

CONCLUSIONS OF LAW

A. Relevant Market

1. Relevant market is an element that must be proven by the Plaintiff in order to prevail in its cause of action under either section 1 or section 2 of the Sherman Antitrust Act.

2. Plaintiff and Defendants did not offer any reasonably interchangeable products or services for customers within the alleged geographic market and thus did not operate in an area of effective product competition. There is no relevant product market or submarket in this antitrust action.

3. Specifically, traditional CATV service, basic telephone service, the so-called "blue-sky" services, and pay TV were not areas of effective competition between Plaintiff and Defendants. None of these services constitutes a relevant market for purpose of this antitrust action.

4. Plaintiff did not engage in the construction and/or operation of CATV's distribution facilities for use by other CATV operators in delivering CATV signals to their own customers. Therefore, such a business is not a relevant product market in this antitrust action.

5. There is no relevant geographic market in this antitrust action because Plaintiff and Defendants did not compete anywhere with respect to any product or service.

B. Standing

1. Neither TV Signal nor H. I. King intended or was prepared, within the meaning of section 4 of the Clayton Act, to offer services other than traditional CATV services either in Aberdeen or anywhere else in South Dakota.

2. Because traditional CATV service was not an area of effective competition between these parties and because there was consequently no possibility of any competitive injury to Plaintiff within the meaning of section 4 of the Clayton Act, any evidence of any alleged damage to Plaintiff's CATV business is irrelevant to this antitrust action.

3. Even if evidence of the alleged injury to Plaintiff's CATV business were relevant, Plaintiff has not sustained its burden of proof as to the "fact of damage" within the meaning of section 4 of the Clayton Act because the added cost of constructing an underground system was offset by the benefits and hence monetary value which such a system provided.

4. Even if Plaintiff's sale of its CATV business can be categorized as a forced sale, the sale was not proximately caused by Northwestern Bell's initial refusal to enter into a pole attachment agreement with Plaintiff.

5. Even if Plaintiff's sale of CATV business were partially attributable to Northwestern Bell's initial refusal to enter into a pole attachment agreement with Plaintiff, such refusal was in no way a proximate cause of Plaintiff's failure to enter the market of "blue-sky" services.

**1100**

6. Any failure by Plaintiff to engage in any business in any of the alleged relevant markets or submarkets and to realize revenues therein was not materially and proximately caused by Northwestern Bell's refusal to grant Plaintiff a pole attachment agreement.

7. Any failure by Plaintiff to realize sufficient savings and additional revenues from its predominantly underground system to offset the initially higher cost of constructing that system was not materially and proximately caused by Northwestern Bell's refusal to enter into a pole attachment agreement with Plaintiff.