## TV SIGNAL COMPANY OF ABERDEEN, a corporation, Appellant,

v.

## AMERICAN TELEPHONE & TELEGRAPH, a corporation, and Northwestern Bell Telephone Company, a corporation, Appellees.

### No. 79–1280.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 9, 1979.

Decided March 20, 1980.

---

Daniel Stark, Washington, D. C., for appellant; Alan Raywid, Burt A. Braverman, and Frances J. Chetwynd, Washington, D. C., and Joseph M. Butler, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, S. D., on the brief.

John D. French, Faegre & Benson, Minneapolis, Minn., for appellees; James Fitzmaurice, John F. Beukema, Minneapolis, Minn., Harold C. Doyle, May, Johnson, Doyle, Becker & Fisher, Sioux Falls, S. D., and Donald R. Shultz, Lynn, Jackson, Shultz & Lebrun, Rapid City, S. D., on the brief.

Before LAY, Chief Judge,* and HEANEY and HENLEY, Circuit Judges.

---

* The Honorable Donald P. Lay became Chief Judge of the Eighth Circuit on January 1, 1980.

1. The term broadband is used in the communications industry to describe a wide range of communications services including, meter reading, stock market quotations, burglar and fire

LAY, Chief Judge.

TV Signal Company of Aberdeen, a South Dakota corporation, appeals the dismissal of its action brought under the antitrust laws against American Telephone & Telegraph (AT&T) and Northwestern Bell Telephone Company (Bell). It originally filed a complaint alleging that the defendants had refused to allow TV Signal to attach its cable, used for transmitting CATV signals, to the defendants' poles. The complaint alleged facts showing that defendants entered into an illegal conspiracy the effect of which was to unreasonably restrain trade in violation of section 1 of the Sherman Act. In addition, it alleged violations of section 2 of the Sherman Act and the Robinson-Patman Act. The district court, the Honorable Axel J. Beck presiding, dismissed the action for failure to state a claim on which relief could be granted. *TV Signal Co. v. American Telephone & Telegraph*, 324 F.Supp. 725 (D.S.D.1971).

This court reversed and remanded for plenary trial on the alleged violations of sections 1 and 2 of the Sherman Act. *TV Signal Co. v. American Telephone & Telegraph Co.*, 462 F.2d 1256 (8th Cir. 1972). We held that the allegations of the complaint were sufficient to state a claim under both sections 1 and 2 of the Sherman Act. In doing so we stated that because CATV had broadband potential, the threat of competition was sufficiently alleged:[1]

> CATV is "one important gateway to entering the broadband market." . .
> The dangers of monopolization have been recognized by the Federal Communications Commission which has said, . .
>
> " * * * by reason of their control over utility poles or conduits, the telephone companies were in a position to

alarm services, at-home shopping services, data service, and two-way television. *TV Signal Co. v. American Tel. & Tel. Co.*, 465 F.Supp. 1084, 1096 (D.S.D.1979); *see General Tel. Co. of Southwest v. United States*, 449 F.2d 846, 851 n.1 (5th Cir. 1971).

preclude or substantially delay an unaffiliated CATV system from commencing service and thereby eliminate competition."

*Id.* at 1260.

Upon remand, trial on the issue of liability proceeded before the Honorable Andrew W. Bogue, sitting without a jury.[2] At the conclusion of all of the evidence, the district court made findings of fact and conclusions of law and entered judgment for the defendants. The trial court held that plaintiff lacked standing to sue and that it had failed to establish the relevant market as required under sections 1 and 2 of the Sherman Act. The court did not make findings on whether the defendants conspired to unreasonably restrain trade or monopolized the market; the court did not consider the other aspects of relevant market once it determined that plaintiff was not a competitor of defendants. We reverse and remand for further proceedings.

*Facts.*

In 1969 TV Signal Company of Aberdeen sought to obtain permission from Bell to attach a coaxial cable to telephone and utility poles within the City of Aberdeen, South Dakota in order to transmit CATV signals. Bell had previously entered into contracts with other utilities which gave it exclusive control over all available communication space on the poles. The Bell System (AT&T and its subsidiaries) had a policy at that time which allowed only one attachment per pole. Bell had already granted to another cable TV operator the right to attach its cable to Bell's poles and on that basis refused to allow TV Signal the right to attach its cable to defendants' poles. Bell offered to build a distribution system and lease it back to plaintiff for distribution of plaintiff's signals. TV Signal refused. In May of 1969 it contracted with Anaconda

Electronics Company to build an underground system at a rate of $5,000 per mile. In October of 1969 when defendants abandoned their one per pole policy because of government rulings, Bell acceded to TV Signal's request and allowed it to attach cable to Bell's poles. The cost of constructing the remainder of the distribution system by attaching cable to the poles was only $3,650 per mile. The entire distribution system was 63.34 miles in length; 15.10 miles of cable were attached to the defendants' poles and 48.24 miles of cable were placed underground.

*Standing.*

The district court held that TV Signal did not intend nor was it able to compete in the area of broadband services and that plaintiff lacked standing because it failed to show that it was a potential competitor of Bell's. It held that there was no proof of any compensable damage to the plaintiff. *TV Signal Co. v. American Telephone & Telegraph Co.*, 465 F.Supp. at 1092. The district court concluded that in spite of the fact that plaintiff was forced to install an underground system at a greater cost, such a system "would have resulted in the complete offset of the initially higher construction costs within a two-year period."[3] *Id.* at 1093. The court further reasoned that plaintiff was not damaged since it ultimately sold its business at a $340,000 profit. The district court held that plaintiff had failed to establish standing because of its failure to prove injury in fact, and proximate cause.

■ We respectfully disagree with this analysis. The notion that a business could not have been injured if it was sold for a profit finds little legal support. It is well recognized that even a profitable business may sustain damage to its property or busi-

---

**2.** The district court limited the trial to the liability issue, with a trial on damages, if necessary, to follow.

**3.** TV Signal did not own the distribution system for two years. Its assets, including the distri-

bution system, were sold less than a year after it formally accepted the system. *TV Signal Co. v. American Tel. & Tel. Co.*, 465 F.Supp. at 1095.

ness by reason of illegal restraints of trade. *See, e. g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906). The Sherman Act "does not require a plaintiff to retain possession of a business oppressed by anti-trust violation until the business is bankrupted or directly shut down by the violator." *Pollock & Riley, Inc. v. Pearl Brewing Co.*, 498 F.2d 1240, 1244 (5th Cir. 1974) (footnote omitted), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975); *accord, Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972).

■ The district court held that the additional cost of an underground system would be offset by ensuing benefits. Even if this were true,[4] it does not foreclose plaintiff from seeking damages under the antitrust law. *Smith v. Pro-Football, Inc.*, 193 U.S.App.D.C. 19, 21, 593 F.2d 1173, 1175 n.2 (D.C.Cir.1979); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 120, 89 S.Ct. 1562, 1574, 23 L.Ed.2d 129 (1969). Conspiracies which result in higher initial costs have a tendency to keep competing forces out of the market. Entrants who might otherwise be able to move into the market may be foreclosed because they are not able to raise the additional start-up capital.

■ Plaintiff urges that the "forced sale" of its business was not the allegation of its injury.[5] The most obvious damage to TV Signal in this case is the increased construction cost which was the result of being forced to go underground rather than attaching the cable to defendants' poles. Plaintiff urges that by reason of Bell's policy of excluding independent CATV operators from its poles, they were forced to either lease channel service from Bell or to go underground. If independent operators chose to lease from Bell, the telephone company would benefit by increased revenues and own the system; if they chose to use other means to construct the system, as TV Signal did, the operator would have to pay more. Plaintiff's evidence established that the higher cost of burying the cable would have a tendency to force operators to lease Bell's distribution system or in some cases forego the business opportunity altogether. This proven injury is "something more than remote, is not derivative but direct, and is the proximate result of [defendants'] misdoing."[6] *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*, 368 F.2d 679,

4. The plaintiff adduced evidence that burying the cable was not only more expensive but detracted from its overall efficiency and use. In 1969 the cable industry had not yet developed satisfactory underground cable and accessories for use in a CATV system. TV Signal used aerial cable in its underground system and there was some evidence that aerial cable which was used underground would corrode rapidly. Underground construction was normally slower and maintenance expenses were greater. As a result of these and other difficulties, plaintiff claimed that aerial construction was far more desirable than underground construction.

5. Numerous cases have granted standing to plaintiffs who continued to make a profit or made a profit in the sale of their business, in spite of being the victim of an antitrust violation. Actually, this argument is a form of the pass-on theory—i. e. because the plaintiff could or did charge a higher price and made a profit it is not entitled to recover. This theory has been consistently rejected. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728, 97 S.Ct. 2061, 2066, 52 L.Ed.2d 707 (1977); *accord, Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489, 88 S.Ct. 2224, 2229, 20 L.Ed.2d 1231 (1968); *Beckers v. International Snowmobile Indus. Ass'n, AMF, Inc.*, 581 F.2d 1308, 1310 (8th Cir. 1978), *cert. denied*, 440 U.S. 986, 99 S.Ct. 1801, 60 L.Ed.2d 248 (1979); *Minnesota v. United States Steel Corp.*, 438 F.2d 1380, 1381–82 (8th Cir. 1971).

6. The district court's finding specifically supports the conclusion that Bell's conduct was the proximate cause of the injury. *TV Signal Co. v. American Tel. & Tel. Co.*, 465 F.Supp. at 1092.

689 (8th Cir. 1966). *See also Reiter v. Sonotone Corp.*, 579 F.2d 1077, 1081–82 n.9 (8th Cir. 1978), *rev'd*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979).

The district court also held that plaintiff lacked standing since it failed to prove that it was either a competitor or potential competitor in the communications market. The district court found that the evidence indicated the projected market had not yet developed; that defendants' one per pole policy had no effect on the development of broadband services; that TV Signal had only minimal intent to engage in any business other than basic CATV services; and that it had not taken *any* preparatory steps which would have allowed it to provide other services. *Id.* at 1097–98.

■ The district court reasoned that in order to have standing there must be overt and objective preparations to expand an existing business into a new market, relying on *N. W. Controls, Inc. v. Outboard Marine Corp.*, 333 F.Supp. 493, 507 (D.Del.1971). We find the district court's analysis does not fully address the precise issue presented here.

### A. *Broadband Services.*

Internal AT&T memoranda demonstrate that the distribution of CATV signals was only the first step in the development of broadband services. This evidence affirmatively establishes defendants' reliance on the belief that broadband was a logical extension of the already existing CATV market. The memoranda made by AT&T officials include these observations:

CATV opens the door to other broadband services that may be provided on facilities not owned by the Telephone Company. If we are to retain our future position in the broadband market, Mr. McKeage's conclusion that we must own the facilities through which CATV, ETV, ITV, stay at home shopping, et al., are provided, appears valid.

Comments on 1967 Visual Mode Task Force, p. 1 (R. 721).

A Market Study of CATV, Phase I, completed in July 1967, pp. 3, 51 (R. 730, 757) stated:

CATV is more than just a cable transmission system for off-air television signals. It is a broadband service with channel capacity to provide additional services. As a result, the variety of services (e. g., ETV, public service programs, movies, signaling channels, etc.), and the numbers of channels available to CATV patrons will continue to increase.

.      .      .      .      .

This chart illustrates the rapid rate of growth that CATV, more appropriately called broadband services, has been having in the penetration of all telephone households. The rate of growth of telephone households being wired with a broadband facility is very significant considering that in the future, this facility may well be used for more than CATV.

A Broadband Market Study done in 1969 (R. 815) recited:

There are, at present, two media through which broadband communications can be provided. Obviously, the Bell System is the most practical medium because of the viability and capability of the organization and facilities which already exist. The CATV industry is the second medium that we can imagine providing broadband communications. Our reasoning is that CATV cables are presently capable of delivering enough spectrum to accommodate both CATV and broadband communications of various types.

The evidence demonstrates the broadband services market was the same as the CATV services market. The broadband market was not a new market but was simply an extension of an existing market. We find the reasoning of *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964, 986–89 n.20 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), more applicable to these circumstances.

[T]he Court does not believe that a going concern, which is the victim of an anti-competitive practice, must forego damages for sales it would have made as the result of the natural expansion of its business simply because it was victimized early in its existence before its attempts to expand could ripen into evidence of preparedness and intent to increase its output. Thus, the question for the Court's determination is whether, under the facts of the present case, the manufacture of units for each type of Volkswagen vehicle in the relevant market can be considered the expansion of a present business into a new market for purposes of standing, *or simply one facet of growth in an ongoing business for purposes of damages.* The line to be drawn between expansion into new areas and growth in established ones is not easily defined and one that must be determined from the facts of each case.

*Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d at 988 n.20 (emphasis added). *See also Forgett v. Scharf*, 181 F.2d 754, 757 (3d Cir. 1950), *cert. denied*, 340 U.S. 825, 71 S.Ct. 59, 95 L.Ed. 606.

Once the cable was in the ground plaintiff had taken sufficient steps to establish itself as a potential competitor since it could eventually expand into broadband services. We make no judgment at this time, as to whether it can prove injury beyond the increased cost of construction. Assuming the trial court's findings that broadband services have not expanded as anticipated and that plaintiff lacked the intent to expand into those services, it may very well be that any injuries other than those specified above would be too speculative and conjectural to prove under the antitrust laws.

### B. *Distribution Facilities.*

There is also a basis in the record to hold that plaintiff was in actual competition with Bell. Bell's one per pole policy provided plaintiff and any other independent operator with the choice of going underground at greater expense, with certain alleged deficiencies, or paying Bell for use of Bell's own distribution system. The evidence showed that Bell could receive as much at 70% to 90% of the CATV revenue if it controlled the distribution of CATV signals. Thus, although plaintiff was not a builder and Bell was not in the CATV business, a fundamental requisite of operation was distribution of the CATV signal. Bell's exclusive control under its one per pole policy placed it in direct competition with any operator who wished to distribute its own CATV signal.

The Department of Justice early recognized that CATV operators and telephone companies were both competitors and potential competitors. In 1970 it stated:

In the [Justice] Department's Comments in Docket 18509, we emphasized that independent CATV operators and the telephone companies were present and direct competitors in the construction of CATV distribution systems. We also stressed the significant potential for future competition between telephone companies and the independent CATV operators in the many uses of broadband cable. This theme was recognized by the [Federal Communications] Commission in its Notice of Proposed Rule-Making in Docket 18397.

We wish to emphasize that the competition we are concerned about goes beyond the provision of television signals to customers. The key to competition between a telephone company and a CATV company is control of the wire or broadband cable which is connected to the premises of each customer. [1] Thus, by selecting a leaseback operator to provide CATV service subject to a restrictive tariff, the telephone company retains control of the cable system and reserves to itself the ability to develop (or block) new uses of the cable, e. g., for data transmission, meter reading, surveillance systems.

The telephone companies have made it clear that they regard cable operators as

potential competitors for a variety of services. For example, while the Bell System is experimenting with meter reading by cable, its tariffs prohibit two-way transmission by a CATV operator.

Comments of the Department of Justice, in FCC Docket 17441, at 18, 20 (1970).

The Fifth Circuit recognized the evil of the one per pole policy in observing:

> Since the telephone companies have a natural monopoly over the means required to conduct a CATV operation, i. e., the poles or conduits, they are in a position to pre-empt the market for this important service. CATV service is the initial practical application of broadband cable technology . . . . CATV is one important gateway to entering the broad-band market . . . .. There is no reason to deny independent operators the opportunity to participate in broadband cable development, yet without adequate regulation the power to deny entry would reside in the telephone companies.

*General Telephone Co. of Southwest v. United States*, 449 F.2d 846, 856–57 (5th Cir. 1971).

The plaintiff has amply demonstrated that it has standing since it was both a competitor and a potential competitor.[7]

*Relevant Market.*

The district court held that plaintiff failed to establish the relevant market because it failed to show that it competed with defendants.[8] The evidence demon-

---

7. In finding no competitive injury the district court relied in part on this court's decision in *Reiter v. Sonotone*, 579 F.2d 1077 (8th Cir. 1978). The opinion of the district court was handed down on February 16, 1979, before the Supreme Court's unanimous reversal of this court in *Reiter v. Sonotone*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). That case makes it clear that competitors are not the only persons who have standing under 15 U.S.C. § 15.

Bell argues as it did on the first appeal, that it is not illegal to enter into an exclusive dealing contract, as it had done here, allowing use of its facilities (poles) to only one operator. It relies on numerous cases: *Donovan v. Pennsylvania Co.*, 199 U.S. 279, 26 S.Ct. 91, 50 L.Ed. 192 (1905); *Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co.*, 276 U.S. 518, 48 S.Ct. 404, 72 L.Ed. 681 (1928); *Export Liquor Sales, Inc. v. Ammex Warehouse Co.*, 426 F.2d 251, 252–53 (6th Cir. 1970), cert. denied, 400 U.S. 1000, 91 S.Ct. 460, 27 L.Ed.2d 451 (1971); *E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority*, 362 F.2d 52 (1st Cir.), cert. denied, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); *Savon Gas Stations Number Six, Inc. v. Shell Oil Co.*, 309 F.2d 306 (4th Cir. 1962), cert. denied, 372 U.S. 911, 83 S.Ct. 725, 9 L.Ed.2d 719 (1963); *Parmelee Transp. Co. v. Keeshin*, 292 F.2d 794 (7th Cir. 1961), cert. denied, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1962). These cases (sometimes called the "Terminal" cases) are clearly distinguishable because in the present case there exists evidence that the purpose of Bell's exclusion policy was to coerce operators to utilize Bell's own equipment, thus yielding greater revenue to Bell, and deterring independent operators from entering the CATV and potential broadband communications fields.

8. There exist two requirements under section 1 of the Sherman Act for proof of relevant market: Plaintiff must establish (1) the relevant geographic market, and (2) the relevant product market. The evidence strongly suggests that the relevant geographic market is Aberdeen. The relevant product market relates to the development of a distribution system and the distribution of CATV signals. Defendants' one per pole policy tends to eliminate competition in the development of distribution systems and the distribution of CATV signals. Neither relevant product market nor relevant geographic market were discussed by the trial court once it determined that TV Signal did not compete with Bell. We feel in light of the remand the trial court should make specific factual findings related to the evidence on these issues. Although plaintiff asserts there is no requirement of proof of relevant market under section 1 of the Sherman Act in contrast to section 2, we disagree. No proof of relevant market is required under section 1 where a per se violation is established. See, e. g., *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); 1 von Kalinowski, Antitrust Laws and Trade Regulation, Ch. 6 (1979). However, where the Rule of Reason governs in section 1 cases, proof of relevant market is necessary to demonstrate the unreasonableness of the restraint. As stated in *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chem. Corp.*, 579 F.2d 20 (3d Cir.), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978):

strates that CATV operators and Bell were both competitors in the market for construction of CATV distribution facilities and distribution of CATV signals and were also potential competitors in the broadband market. AT&T memoranda warned company officials against allowing CATV operators to provide services which were in direct competition with AT&T or even furnishing non-CATV services. To prevent this competition, it was recommended that the Bell System attempt to gain ownership and control of the delivery system. Numerous memoranda indicate that AT&T was worried about losing control of the broadband market and therefore sought to own and control the "pipe", i. e. the delivery system. AT&T was also aware that its practices might be considered anti-competitive and for that reason it advised against discontinuing all pole attachments. In particular, AT&T felt that CATV operators might constitute a threat to its development of the picture phone. As for competition with CATV operators in the construction of delivery systems, AT&T's vice-chairman of the board, William Ellinghaus, admitted testifying to the FCC that:

> We are naturally competing in this area with the operator who chooses to construct his facilities, you know, as many of them do . . . .

We conclude that plaintiff was in direct competition with defendants. The area, in which they competed was a submarket of the CATV industry, the construction of CATV distribution facilities and the distribution of CATV signals. *See Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). The mere fact that TV Signal was building a distribution facility for its own use did not prevent it from being considered a competitor of Bell who builds such facilities for

As we have intimated in prior cases, the inquiries into the scope of competition under § 1 and § 2 are not precisely the same. . . The § 2 market definition looks to the existence of competitors as evidence of countervailing power which would preclude monopo-

use by others. *Cf. United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir. 1945) (Alcoa required to include aluminum produced for its own use in determining relevant market).

The fact that Bell allowed one operator to attach cable to its poles does not make the restriction reasonable. As defendants' own records indicate, one of the reasons for allowing the single attachment was to placate those who might accuse them of violating the antitrust laws.

■ We thus find that plaintiff has demonstrated (1) standing as a competitor and potential competitor, (2) evidence of injury in fact based on its increased cost of construction which was, (3) proximately caused by Bell's one per pole policy. On this basis we vacate the judgment in favor of the defendants and remand for further findings on the remaining issues.

HENLEY, Circuit Judge, concurring.

I agree that the district court's judgment in this case must be reversed and the cause must be remanded for further proceedings, but my reasoning in reaching this result differs somewhat from that of the majority. The district court rested its judgment for defendants on two alternative grounds: that plaintiff lacked standing and that plaintiff failed to demonstrate the existence of a relevant product market. Logically the question of standing must be considered first.

*Standing*

The district court gave three reasons for holding that plaintiff lacked standing: (1) since "Plaintiff's business was in no way in competition with or in impending competition with the business of Defendants, Plaintiff's alleged injury [was not] the type of injury against which the antitrust laws

lization. § 1, in contrast, is concerned with patterns of competition as a means of judging whether a restraint of trade is unreasonable.
*Id.* at 27 n.11 (citations omitted).

were designed to protect";[1] (2) the higher initial cost of construction of plaintiff's underground system would be offset within two years by the advantages of that system over an all-aerial one; and (3) plaintiff's inability to enter the broadband market and the "forced" sale of plaintiff's business were not causally related to the one per pole policy.

Judge Lay's majority opinion fully discusses the errors in the district court's second and third reasons for denying standing, see pp. 1305–1307 supra, and I readily concur in that part of the opinion. The first reason given by the district court (the absence of competition between the parties) seems to have been rejected by the majority, after lengthy consideration, on the ground that plaintiff was both an actual and potential competitor of defendants. See pp. 1307–1312 supra. For reasons to be stated, I prefer to approach the issue of standing somewhat differently.

The private treble damages action for antitrust violations was created by section 4 of the Clayton Act, and the starting point for analysis of whether a given plaintiff can maintain such an action should be the statutory language. It provides in relevant part:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained
> . . . ..

15 U.S.C. § 15 (1976). In the present case, it is clear that the higher initial cost of construction, incurred by plaintiff as a result of Bell's denial of access to its poles, constituted injury to TV Signal's "business or property." See Reiter v. Sonotone Corp., 442 U.S. 330, 99 S.Ct. 2326, 2331–32, 60 L.Ed.2d 931 (1979); Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 396, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906). In its rejection of the district court's second reason for denying standing, the majority

holds—and I agree—that for purposes of standing this increased cost is not subject to reduction by the amount of any eventual offsetting benefits of an underground system. See p. 1306 supra. Thus, whether plaintiff has standing depends only on whether its injury occurred "by reason of" the alleged antitrust violation.

The lower federal courts have attempted to construe this phrase, "by reason of," so as to limit the right to bring a treble damages action to those persons whom Congress intended the antitrust laws to protect. For this purpose the courts have developed two tests: the "direct injury" test and the "target area" test. In re Multi-district Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 125–30 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); Ragar v. T. J. Raney & Sons, 388 F.Supp. 1184, 1186–87 (E.D.Ark.), aff'd per curiam, 521 F.2d 795 (8th Cir. 1975). In general, the direct injury test denies standing in those cases where a third-party victim of the violation comes between plaintiff and defendant, see, e. g., Nationwide Auto Appraiser Serv., Inc. v. Association of Cas. & Sur. Cos., 382 F.2d 925 (10th Cir. 1967); Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 395 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518 (3d Cir.), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956), whereas the target area test asks whether plaintiff is "within that area of the economy which is endangered by a breakdown of competitive conditions," Conference of Studio Unions v. Loew's Inc., 193 F.2d 51, 55 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952); see, e. g., Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679, 688–89 (8th Cir. 1966); South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966).

Although the courts usually apply one of these tests to the exclusion of the other,

---

1. *TV Signal Co. v. American Tel. & Tel. Co.*, 465 F.Supp. 1084, 1091 (D.S.D.1979).

and although *Sanitary Milk* seems to indicate that the test to be applied in the Eighth Circuit is the target area test, it is unnecessary in the present case to decide which of the two tests to apply because TV Signal has standing whichever is applied. As noted in the majority opinion, *see* p. 1306, note 6 *supra*, the district court found that plaintiff's increased construction cost was "a direct consequence of . . . Bell's refusal to enter into" a pole attachment agreement, 465 F.Supp. at 1092, and the refusal was entirely due to the alleged violation, the one per pole policy. It is also clear that the injury to TV Signal occurred "within that area of the economy . . . endangered by a breakdown of competitive conditions," *i. e.,* the construction and control of CATV distribution systems. Since TV Signal was "injured in its business or property" and since the requirements of both the direct injury test and the target area test are met in the present case, plaintiff has standing.

Contrary to the district court's opinion, neither section 4 nor the direct injury test nor the target area test requires that plaintiff and defendant be competitors in order for plaintiff to have standing. Plaintiffs who were not in competition with defendants have been held to have standing in many treble damages actions.[2] And in the circumstances of this appeal, competition assumes significance primarily, if not entirely, in only two ways: in determining the target area in which there may be a breakdown of competitive conditions, and in defining the relevant market on which to measure the restrictive effects of the one per pole policy and the possession of monopoly power by defendants. For both these purposes, it is fortuitous that defendants happen to be competitors of plaintiff. For the above reasons, I (1) expressly reject the district court's premise that plaintiff must be a competitor of defendants in order to have standing, (2) find that TV Signal does have standing, on the grounds stated in the three preceding paragraphs, and (3) pretermit extended discussion of actual or potential competition in resolving the issue of standing.

*Relevant Market*

As an alternative ground for dismissing the complaint, the district court held that plaintiff was required to define the relevant market in order to recover under either section 1 or section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and that plaintiff failed to show the existence of a relevant product market, one of the two components of the relevant market. I believe the first part of this holding was correct, except as regards plaintiff's claim that the one per pole policy was a per se violation of section 1. It is clear that proof of relevant market is not a prerequisite to recovery for a per se violation.[3] Insofar as footnote 8 of the majority opinion states this proposition, I concur therein.

The second part of the district court's holding was that plaintiff did not establish a relevant product market, because plaintiff and defendants were not in competition. It is, however, undisputed that plaintiff built

2. *See, e. g., Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); *Chattanooga Foundry & Pipe Works v. City of Atlanta,* 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906); *Greene v. General Foods Corp.,* 517 F.2d 635 (5th Cir. 1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976); *Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073, 1076 (9th Cir. 1970), *cert. denied,* 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971); *South Carolina Council of Milk Producers, Inc. v. Newton,* 360 F.2d 414 (4th Cir.) *cert. denied,* 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966); *Bales v. Kansas City Star Co.,* 336 F.2d 439, 444 (8th Cir. 1964).

3. 54 Am.Jur.2d *Monopolies* § 32 (1971) (footnotes omitted):

[A] per se violation is conclusively presumed to be unreasonable, and hence illegality does not depend on a showing of the unreasonableness of the practice and it is unnecessary to have a trial to show the nature, extent, and degree of its market effect.

a CATV distribution network in Aberdeen, that defendants were prepared to build their own system for lease to plaintiff, and that the two systems would have been "reasonably interchangeable" for purposes of delivering CATV signals to the homes of customers. I agree with the majority that "[t]he evidence demonstrates that CATV operators and Bell were both competitors in the market for construction of CATV distribution facilities . . .." Since this finding requires reversal of the district court and disposes of the issues now before this court, I find it unnecessary to discuss the internal AT&T memoranda, the reasons for defendants' maintenance or revision of their one per pole policy, or the reasonableness of the policy. These matters, if discussed by us at all, should be considered only after further developments in the trial court.

I concur in the remand of the case for decision of plaintiff's claims on the merits.