**ANAREN MICROWAVE, INC., Plaintiff.**

v.

**LORAL CORP., Louis H. Oberndorf, and Victor D. Cohen, Defendants.**

No. 90 Civ. 2605 (JES).

United States District Court, S.D. New York.

June 15, 1994.

Parker Chapin Flattau & Klimpl (Joel M. Wolosky, of counsel), New York City, for plaintiff.

Willkie Farr & Gallagher (Benito Romano, John Halloran, of counsel), New York City, for defendants Loral Corp. and Louis H. Oberndorf.

**MEMORANDUM OPINION AND ORDER**

SPRIZZO, District Judge.

The above-captioned action arises out of the United States Air Force's ("Air Force"), Litton Industries Inc.'s ("Litton") and defendant Loral Corp.'s ("Loral") settlement in the "Ill Wind" defense contract procurement fraud investigation of Loral's alleged improprieties during competitive bidding for a $185 million advanced radar warning receiver contract. For the reasons that follow, the defendants' motion for summary judgment is granted.

**BACKGROUND**

Beginning sometime before 1981, and continuously thereafter, Litton Applied Technology Division ("LATD"), a division of Litton Industries Inc. ("Litton"), supplied the Air Force with the model ALR–69 advanced radar warning receiver system ("ARWR") to be used in F–16 aircraft to alert a pilot when the aircraft has been targeted by an enemy aircraft or missile. *See* Affidavit of Benito Romano, Esq. dated January 9, 1993 ("Romano 1/9/93 Aff."), Ex. 14. Plaintiff Anaren Microwave Inc. ("Anaren"), a supplier of electronic components for use in military systems, *see* Amended Complaint ¶ 6, supplied Litton with an Instantaneous Frequency Measurement Receiver ("IFMR"), an integral component of Litton's ARWR. *See* Affidavit of Thomas Michalski dated March 31, 1993 ("Michalski Aff."), ¶ 54.

In or about 1985, the Air Force contracted with defendant Loral to develop a competing ARWR to be used in F–16 aircraft (the "ALR–56M"). *See* Amended Complaint ¶ 15–16. On or about September 16, 1988, the Air Force requested bids for the manufacture and sale of ARWRs from both Litton, through LATD, and Loral. *See* Michalski Aff. ¶ 16. In response, Litton submitted a proposal for an ALR–74 system, based on it's ALR–69 technology, and Loral submitted a proposal for an ALR–56M system. *See* Michalski Aff. ¶ 16. On or about December 20, 1988, the Air Force awarded the contract to Loral, calling for a delivery of nineteen

ALR–56M systems between June 1990 and March 1991 at a purchase price of $20.4 million ("Lot I"). *See* Michalski Aff. ¶ 17. The contract also provided the Air Force with options to purchase an additional 654 systems in three lots ("Lots II–IV") for $189.6 million. *See* Michalski Aff. ¶ 17.

Shortly thereafter, on or about December 27, 1988, the United States District Court for the Eastern District of Maryland unsealed portions of an FBI special agent's affidavit filed in connection with the Justice Department's Ill–Wind investigation and to support a search warrant for the residence of defendant Dr. Victor D. Cohen ("Cohen"), a former Air Force procurement officer. *See* Romano 1/9/93 Aff.Ex. 11; Michalski Aff. ¶ 21. The affidavit suggested that prior to bidding, Loral and defendant Louis H. Oberndorf ("Oberndorf"), a senior Loral officer, had hired defense industry consultant William M. Galvin ("Galvin"), who acted as a consultant for both Loral and Litton, *see* Romano 1/9/93 Aff.Ex. 11 at 21, to obtain for Loral a book containing technical data on the methodology Litton used to test its ARWR prototype. *See* Michalski Aff. ¶ 21, 26. Review of this proprietary information allegedly made it possible for Loral to improve its ALR–56M system and to underbid Litton. *See* Michalski Aff. ¶ 24.

In December 1989, Loral waived prosecution by indictment, and pleaded guilty to a three count information that charged Loral with conspiracy to defraud the United States, conversion of government property and filing a false statement. *See* Amended Complaint Exs. A, C. Thereafter, in March 1990, Galvin waived prosecution by indictment and pleaded guilty to a four count information that charged him with conspiracy to defraud the United States and to commit bribery, bribery, and tax evasion. *See* Amended Complaint Exs. D, E; Amended Complaint ¶ 1. In September 1992, Oberndorf waived prosecution by indictment and entered a plea of guilty to the charges of conspiring to defraud the United States and to convert government property. *See* Affidavit of Joel

M. Wolosky dated December 22, 1992 ("Wolosky Aff."), Exs. 3, 4.

Despite this apparent confession of fraud in the bidding process for the ARWR contract, the Air Force declined to terminate the contract with Loral. After information surrounding the investigation became public, however, Litton challenged the Air Force's award of the ARWR contract through the General Accounting Office ("GAO"). *See* Romano 1/9/93 Aff.Exs. 12, 33. On or about May 12, 1989, the GAO sustained Litton's protest. *See* Romano 1/9/93 Aff.Ex. 25. On or about September 12, 1989, the GAO denied the Air Force's request for reconsideration and recommended that the Air Force terminate Loral's contract. *See* Romano 1/9/93 Aff.Ex. 27.

By letter dated December 28, 1989, the Air Force declined to accept the GAO's recommendation. Romano 1/9/93 Aff.Ex. 32 at 2. Instead, rather than re-bid the contract, and as part of Loral's plea agreement, *see* Wolosky Aff.Ex. 7, Loral and the Air Force restructured the contract to provide that Litton would become a second source, without competition, for three of the five primary components in the new ARWR, *i.e.*, to supply the ALR–56M's DF receiver, CD receiver, and analysis processor. *See* Michalski Aff.Ex. 6. Litton agreed to this settlement, *see* Michalski Aff.Ex. 6, which was approved by the District Court for the Eastern District of Virginia. *See* Romano 1/9/93 Aff.Ex. 32 at 1. This restructuring agreement did not benefit Anaren, however, because the ALR–56M does not incorporate Anaren's IFMR.

Anaren commenced this action in 1990. Anaren alleges ten claims based on violations of the Robinson–Patman Act, 15 U.S.C. § 13(c) (Count 1), the Sherman Act, 15 U.S.C. §§ 1 and 2 (Count 2), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 (Counts 3–5), and state common and statutory laws (Counts 6–10). Defendants Loral, Oberndorf, and Cohen moved for summary judgment on all of Anaren's federal claims for antitrust and RICO violations.[1]

---

1. Although plaintiff's original Complaint named William Galvin as a defendant, Galvin was dropped as a defendant when plaintiff filed its Amended Complaint, which names only Loral, Oberndorf, and Cohen, as defendants.

## DISCUSSION

Summary judgment may be granted only where "there is no genuine issue as to any material fact" and a party is "entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Although the movant bears the initial burden of showing that there are no genuine issues of material fact, once such a showing is made, the party opposing a properly supported motion must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). To establish a genuine issue of fact, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts"; it must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (quoting Rule 56(e)). Absent such a showing, summary judgment is appropriate since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Despite the broad language of the civil action provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO") § 1964(c), 18 U.S.C. § 1964(c), and the Clayton Act § 4, 15 U.S.C. § 15(a), after which § 1964(c) is modeled, Supreme Court precedents make clear that Congress intended to limit standing in civil actions under both provisions to those plaintiffs who can establish the common law requisite of proximate cause. *Holmes v. Securities Investor Protection Corp.,* — U.S. —, — – —, 112 S.Ct. 1311, 1317–1318, 117 L.Ed.2d 532 (1992); *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983); *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476–78, 102 S.Ct. 2540, 2546–48, 73 L.Ed.2d 149 (1982). It is Anaren's complete failure of proof concerning this essential element that requires this Court to grant summary judgment.

To establish proximate cause, a plaintiff must show an adequate nexus between the alleged violation and the alleged harm to the plaintiff. An injury that derives from harm suffered by another is insufficient. *See Holmes, supra,* — U.S. at —, 112 S.Ct. at 1318; *see also TV Signal Co. of Aberdeen v. American Telephone & Telegraph,* 617 F.2d 1302, 1306–07 (8th Cir.1980) (quoting *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.,* 368 F.2d 679, 689 (8th Cir.1966) (holding that a plaintiff's injury must be "something more than remote, . . . not derivative but direct, . . . and the proximate result of [the defendant's] misdoing.")).

In *Holmes,* the plaintiff, Securities Investor Protection Corp. ("SIPC"), alleged that the defendant had conspired in a stock-manipulation scheme that disabled two broker-dealers from meeting obligations to customers. This failure to meet obligations triggered SIPC's statutory duty to advance funds to reimburse the customers. The Supreme Court held that SIPC could not recover from the defendant under RICO, even as a subrogee standing in the shoes of the customers, because "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Holmes, supra,* — U.S. at —, 112 S.Ct. at 1319. Anaren's Amended Complaint suffers from the same infirmity.

Similarly, in this case no rational jury could conclude that Anaren's alleged lost subcontract profits are not merely derivative of the prime contractor Litton's injuries. *See Holmes, supra,* — U.S. at —, 112 S.Ct. at 1318; *see also Manson v. Stacescu,* 11 F.3d 1127, 1132 (2d Cir.1993) (an "employee's injury generally is derivative of that of the corporation and does not satisfy RICO's proximate cause requirement."). Loral has allegedly injured Anaren only insofar as the procurement fraud first injured Litton and thus left Litton without a contract on its ALR–74 for which to hire any subcontractor. Indeed, the Amended Complaint itself alleges that its injury "ar[ose] from Litton's failure to be awarded the RWR contract." *See* Amended

Complaint ¶¶ 40, 50, 60, 64, 68. The derivative nature of Anaren's injury is made especially evident by the fact that it was Litton's decision to compromise its injury in the fashion described above which effectively precluded Anaren from participating in the contract at issue.

It follows that Anaren's argument that, as a virtually guaranteed subcontractor on any ALR–74 contract Litton procured, Anaren stood in the shoes of Litton as a competitor with Loral is unsupportable because "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *Holmes, supra,* —— U.S. at ——, 112 S.Ct. at 1318. In sum, because Anaren's claims are merely derivative of Litton's rights, no rational jury could conclude that Loral's alleged procurement fraud was the proximate cause of Anaren's lost profits.

Anaren's reliance on *McCready, supra,* 457 U.S. at 465, 102 S.Ct. at 2540, and *Standardbred Owners.Ass'n v. Roosevelt Raceway Assocs.,* 985 F.2d 102 (2d Cir.1993) is misplaced because in both those cases the Supreme Court and the Second Circuit, respectively, found that the injury to those plaintiffs was not derivative or based upon the injury to anyone else. *See McCready, supra,* 457 U.S. at 476–78, 102 S.Ct. at 2546–48;[2] *Standardbred Owners, supra,* 985 F.2d at 104 ("Plaintiffs ... are not making a claim that is derivative of injury, if any, sustained by the IDA."). Here, Anaren admits that its injury arose from Litton's, and therefore these cases are factually inapposite.

Accordingly, Anaren's complete failure of proof on an essential element of both its

antitrust and RICO claims entitles the defendant to summary judgment in its favor as a matter of law. *See Celotex v. Catrett, supra,* 477 U.S. at 323, 106 S.Ct. at 2552. Finally, because the defendants' motion is dispositive of all federal claims, plaintiff's pendent state law claims also can and should be dismissed without prejudice for lack of subject matter jurisdiction. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment shall be and hereby is granted. The Clerk of Court is directed to close the above-captioned action.

It is **SO ORDERED.**

conspirators was to halt encroachment by psychologists into a market that physicians and psychiatrists sought to preserve for themselves, McCready's injury was not "remote" because "[d]enying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends." *Id.* at 478–79, 102 S.Ct. at 2548. The subscriber therefore suffered her own injury which was not derivative of any injury to the psychologists, and indeed was the very means by which the injury to the psychologist was inflicted.

---

**2.** In *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), a group health plan subscriber claimed that she had been the victim of a concerted refusal to pay when her group health plan, motivated by a desire to deprive psychologists of the patronage of its subscribers, refused to reimburse her for a psychologist's services. The Supreme Court rejected the argument that "because the alleged [antitrust] conspiracy was directed ... at psychologists, and not at subscribers ..., only psychologists might maintain suit." *Id.* at 478, 102 S.Ct. at 2548. Rather, the Supreme Court held that notwithstanding the fact that the goal of the